## BENTLEY v. BROSSARD et al.

No. 1851.    Decided March, 1908 (94 Pac. 736).

1. PARTNERSHIP—CREATION AND REQUISITES—NATURE OF RELATION. In order to constitute a "partnership" the members must join together to carry on an adventure for their common benefit, each contributing property or services, and having a community of interest in the profits.

2. SAME—COMMUNITY OF INTEREST IN PROFITS AND LOSSES—SHARING OF PROFITS. Though there is no express agreement in a partnership contract to share losses, an agreement to share profits amounts. *prima facie* to an agreement to share losses also.

3. MINES AND MINERALS—MINING PARTNERSHIP—THE RELATION— CREATION AND EXISTENCE. Defendant B. agreed with the owner to work and develop mines belonging to the latter, B. to furnish the necessary labor, etc., and to be entitled to half the profits, which were to be divided after they had reached a certain amount, when he was to receive a half interest in the mine, and was also entitled, under the contract, to purchase a half interest therein for a certain sum at any time. B. and the other defendants thereafter entered into a contract by which they contributed various. amounts to enable them to work the mine for the purpose of securing the option and other rights to which B. was entitled under his contract with the owner; B. agreeing to convey to the other defendant an interest, proportionate to their respective contributions, in the half interest in the mine to which he was entitled under his contract, to pay to them a share of the profits in the mine out of the undivided half thereof to which he was entitled in proportion to their contributions, and to return to them any part of the money contributed which was not used in developing the mines. *Held,* that the agreement between B. and the other defendant created the relation of partnership.

4. PARTNERSHIP—INTENT OF PARTIES. If parties make such stipulations as in law constitute a partnership, they will be liable as partners, though they did not intend to render themselves liable as such, and an agreement that they shall not be liable as partners is immaterial.

5. SAME—COMMUNITY OF INTEREST IN PROFITS. While a community of interest in the profits is not of itself conclusive of the existence of a partnership, it is of the very essence of the contract, and a partnership cannot exist without it.

6. MINES AND MINERALS—CONTRACTS — LEASES — CONSTRUCTION OF MINING LEASES — ASSIGNMENT — EQUITABLE ASSIGNMENT. Where defendant B. obtained a lease to mines by which he was to work the mine and receive half of the profits and a half interest therein, with a privilege of buying a half interest therein for a stated price at any time during the lease, and thereafter entered into an agreement with the other defendants by which they were to contribute certain amounts to develop the mines, and B. agreed to give them an interest in his share of the profits, and to convey to them an interest in his share in the mine under his contract with the owner, B's contract with the other defendants was, between themselves, an equitable assignment of the lease, and it was immaterial, as between B. and the other defendants, that his contract with the owner stipulated that he could not assign or sublet the lease, since that provision was for the benefit of the owner.

7. SAME—"MINING PARTNERSHIPS"—CREATION AND EXISTENCE. A "mining partnership" may exist, though all of the partners may not have a personal interest in the property, if they have an interest· in the working of the property, and it is not essential that there be an express agreement to become partners, or an express agreement to share profits and losses, as that is an incident to the prosecution of the general business.

8. SAME—DISTINCTIONS BETWEEN "MINING AND TRADING PARTNERSHIPS." The principal distinctions between a "trading partnership and a mining partnership" are that a member of the latter may assign his interest without the consent of his copartner, and neither the assignment of a partner's interest nor the death of a partner works a dissolution of the partnership; that the assignee of an interest in the partnership becomes a partner without the assent of the other partners, and a member of a mining partnership has not the power to bind his associates by engagements with third persons to the same extent as a member of a trading partnership.

9. SAME—RIGHTS AND LIABILITIES OF PARTNERS. A mining partnership is not founded on the *delectus personae* of the members, and the powers of the members or managers of mining partnerships are limited to the performance of such acts in the name of the partnership as may be necessary to the transaction of its business, or are usual in like concerns, unless there is an express agreement to the contrary known to the party dealing with the member, and hence such partner may not borrow money, employ counsel, execute notes, etc., on behalf of the partnership.

10. SAME. The employment by the managing partner of defendant mining partnership of plaintiff, a mining engineer, together with other laborers, for the purpose of developing the property, was necessary to the transaction of the business, and usual in like concerns, and hence was within the implied power of such partner, and binding upon the firm.

11. PARTNERSHIP—THE RELATION—MUTUAL AGENCY. The proof of agency among alleged partners does not show the existence of a partnership, since the mutual agency of the partners results from the existence of the partnership, and not the partnership from the fact of agency.

12. MINES AND MINERALS—OPERATION OF MINES—RIGHTS INCIDENT TO WORKING—ACTIONS FOR LABOR—EVIDENCE—SUFFICIENCY. In an action against defendants as mining partners, the evidence held to show that defendant B. did not direct the working of certain mines for his individual benefit, but for, the benefit of all of defendants.

13. TRIAL—VERDICT—DISREGARD OF INSTRUCTIONS. Instructions to a jury are the law of the case, which the jury must follow whether they consider such instructions correct or not, or whether the instructions are in fact correct; and, where a verdict is in disregard of instructions, it should be set aside by the trial court.

McCARTY, C. J., dissenting.

APPEAL from District Court, Cache County; J. H. Howell, Presiding Judge.

Action by W. H. Bentley against A. Brossard and others. From a judgment for a part of defendants, plaintiff appeals.

REVERSED AND REMANDED FOR A NEW TRIAL.

*Booth, Lee & Badger* for appellant.

*Nebeker, Hart & Nebeker* for respondents.

STRAUP, J.

This action was brought to recover the sum of $212 alleged to be due plaintiff from the defendants for labor performed on certain mining claims operated by the defendants. It is alleged in the complaint that the defendants entered into a contract in writing whereby they associated themselves together as copartners for the purpose of developing, improving and operating certain mining claims, naming them, known as the "Wakefield Group of Mines," situate near Tuscarora, Nevada, and for the purpose of extracting ore therefrom; that

the defendants entered upon the work of developing and operating the properties and in carrying on mining operations thereon under their contract of partnership; that the plaintiff was employed by the defendants as an engineer to work upon the properties, and that in the course of his employment he performed labor thereon between the 1st day of August and the 23d day of September, 1903, at the agreed price of $4 per day; that there was due him and owing from the defendants and each of them the sum of $212. The defendants A. F. and O. A. Caldwell were not served with process, and no appearance was made by them. The other defendants answered, pleading the general issue. A trial was had before the court and a jury.

Some of the defendants reside at Logan, Utah, and the others in southern Idaho. The defendant Brossard, who had examined the group of mines, spoke to the other defendants about them. Thereupon Brossard, in October or November, went to Tuscarora, and there negotiated with L. Fannof, the owner of the group, for a lease, upon substantially the following terms: That Fanhof was to deliver possession of the property to Brossard, who was to work and develop the claims in such manner as Brossard deemed proper; that Brossard was permitted to sell all the ores obtained from the mines while working them under the lease, and that the money received therefor should be disposed of as hereinafter stated; that Brossard should employ at least six men every twenty-four hours, and that three men should be kept at work on said mines each day, and three men each night; that the property should be worked in a workmanlike manner, etc., and that Fannof should not be responsible for the payment of the labor employed or material furnished, etc.; that all moneys derived from the sale of ores should be deposited with the First National Bank at Logan, and should be subject to the check or draft of Brossard, and that he should be permitted to use so much thereof as was necessary to pay all expenses, etc., and that all moneys derived from the sale of ores in excess of the expenses should be equally divided between Brossard and Fannof; that if the moneys derived from the sale of ores were not sufficient to pay

for all the expenditures, etc., Brossard was required to pay them, and that Fannof was in no way to be held responsible therefor; that the moneys in excess of the expenses were to be kept and allowed to remain in the bank until the sum amounted to $20,000, when it was to be equally divided between them, in which event Fannof was required by a good and sufficient deed to convey to Brossard an undivided one-half interest in and to the group of mines; that Brossard also had the option at any time within the life of the contract to purchase an undivided one-half interest in and to the group for the sum of $10,000, and on the payment of which sum Fannof was also required to execute a conveyance to him of such undivided one-half interest; that the contract was to continue so long as the work was being performed under the terms of the contract, and until the conveyance of the one-half interest was made; that Brossard was given the right to abandon the work under the contract at any time; that if steam power should be used upon the property Fannof was to be employed as engineer at current wages; and that Brossard could not sublet or assign the contract without the consent of Fannof in writing. The contract contained other matters of minor importance not necessary here to mention. Shortly after the terms of this contract were agreed upon, but before the contract was signed, Brossard returned to Logan, and there exhibited a copy of the contract to the other defendants. Thereupon the defendants above named, in the early part of December, 1902, entered into the following contract:

"This agreement made and entered into at Logan City, Utah, between A. Brossard, the first party, and the other defendants above named, second parties, witnesseth: That whereas the first party has leased from L. Fannof of Tuscarora, Nevada, mining claims situated in the said Tuscarora mining district, state of Nevada [naming them]; and whereas it is deemed advisable and agreed by the parties hereto that the sum of $5,000 shall be furnished for the development of the said mining claims and the carrying out of the said contract when completed by the first party therein and the said L. Fannof for the development of the said mining claims and

for earning and securing the option in said contract set forth: Now, therefore, it is hereby agreed by the parties hereto that they will respectively furnish amounts aggregating the sum of $5,000 in respective amounts as follows, to-wit, the said A. Brossard the sum of $1,000, the said Jacob West the sum of $1,000, the said R. A. Caldwell the sum of $1,000, the said A. F. Caldwell the sum of $1,000, the said J. M. Blair the sum of $500, the said Mattie B. Hanson the sum of $250, and the said Orin A. Caldwell the sum of $250. And it is agreed by the parties hereto that in pursuance of his contract with L. Fannof of the undivided one-half of the said mining claims as in said contract stipulated that the said first party will convey to the second parties hereto an undivided interest in the said mining claims in proportion to the amounts invested by the parties herein as above set forth, that is to say; to the said Jacob West the one-tenth undivided part of each and all of the said mining claims, to the said R. A. Caldwell the one-tenth of each and all of the said mining claims, to A. F. Caldwell the undivided one-tenth of each and all of the said mining claims, to the said J. M. Blair the undivided one-twentieth of each and all of the said mining claims, to the said Mattie B. Hanson an undivided one-fortieth in each and all of the said mining claims, and to Orin A. Caldwell an undivided one-fortieth in each and all of the said mining claims. And the said first party hereby agrees that if the said sum of $5,000, or any part thereof, should not be needed for the development work on the said mining claims for the reason that the moneys derived from sale of ores obtained from working said mining claims should pay the expense or part of the expense in developing said mining claims, that in any such event the first party will return to the second parties all such parts and proportions of the said sum of $5,000 remaining unused, or if used temporarily, then refunded or reimbursed from sale of ores, as the second parties shall be entitled to, pro rata, according to the amounts advanced and paid into this enterprise as herebefore set forth.

33 Utah—26

And the first party hereby further agrees that according to the terms of said contract with L. Fannof any moneys that shall remain on hand to be divided between the said L. Fannof and the first party in accordance with their said contract that the said first party will pay to each of the second parties the proportion of all such moneys received by him as the said amount furnished by the second parties as aforesaid bears to the whole sum of $5,000, as aforesaid; that is to say, that each of the parties of this contract shall receive his pro rata share according to the part of the said moneys which shall be furnished by him in accordance with this contract of all moneys that may come to the said first party in pursuance of his said contract with L. Fannof."

At about the time of the making of the foregoing contract, and before the lease between Brossard and Fannof was actually signed, R. A. Caldwell, West, Blair, Hanson, and Brossard contributed $3,000. Brossard then departed for Nevada, and thereafter the lease was signed and executed on the 13th day of December, 1902. Brossard thereupon took possession of the properties and commenced work on the 15th day of December, 1902, and with the moneys contributed and paid over to him he employed men, purchased supplies, etc., and commenced active operations. The work consisted in sinking shafts, running tunnels, and making cross-cuts in search of ores. In March, 1903, $2,000 more was contributed by the same parties and A. F. Caldwell. In May $2,500, and in June, 1903, an additional sum of $2,500, were contributed by the same parties and some others who had come into the association, making, in all, a total contribution of about $10,000. The record does not disclose the amount contributed by each, nor do we regard such fact material, in view of the issues presented by the pleadings and the questions involved in the case. The operation of the mines was continued until some time in September, 1903. All of the moneys contributed were used in paying men, in buying supplies, and in working and developing the mines. Brossard had charge of the work, and directed and controlled the supervision of it, and employed the men, and purchased the supplies. The record further shows

that no pay ore was found, and that in July Brossard called upon some of the parties for additional contributions, but it is not clear that he called on any of them, except A. F. Caldwell and a Mr. Pike, who became a party to the agreement in March, 1903. However, no further contributions were made. The evidence further shows that R. A. Caldwell visited the properties four or five different times, especially in July and in August, 1903, when he was there about a month, inspecting and examining the workings. He was also at the property and remained there when Brossard left in September. While the operations were being carried on Brossard saw the several defendants and explained to them, especially to R. A. Caldwell and West, the location of the veins, where the ore beds were supposed to be, the sinking of the shafts, the running of the crosscuts, the purchase of a pump, etc., and other workings and operations of the mine. R. A. Caldwell testified that before the contract of the defendants was signed, "Brossard had seen me in regard to the mining venture, and had told me about this group of claims. He told me he had a chance to get a contract on them. He stated the terms of the contract as near as I can remember. With that understanding, and with the representations of Mr. Brossard, that he could get a contract with Fannof, I signed the contract with Mr. Brossard, and put up the money on the contract. Mr. Brossard had a contract with Fannof in his possession, but it was not signed." He further testified that he paid the money for the development of the property, and so that Brossard could comply with his contract with Fannof, and so that he (Caldwell) could get something in the future. It was further testified to by Fannof, and in part corroborated by other witnesses that R. A. Caldwell at the mines stated that Brossard represented him and others, and that he was interested in the property; that it cost him $55 a day to run the mine; that had Brossard put up his share as he had agreed to do there was no necessity of owing anything at the mine. Fannof also testified that West stated that Brossard had been sent to the property by himself and others, and that he had not carried out instructions, and that, if things could be arranged satisfactorily,

money would be put up to pay the bills, and the work would
be resumed. Plaintiff also gave evidence tending to show that
he was employed at the instance and request of Brossard and
R. A. Caldwell. Defendants R. A. Caldwell and West denied
that they had employed plaintiff, or that they had stated that
Brossard represented them, or that he had been sent to the
property by them. It is further shown that after the working
of the mines had stopped, and in November, 1903, the defend-
ants and Fannof met several times and discussed propositions
of forming a corporation to take over the unpaid bills and to
resume work, but nothing resulted from such meetings. It
was conceded by the defendants that the plaintiff was em-
ployed by Brossard, and that he rendered services as an en-
gineer in and about the workings and operations of the mines,
and that the value of his services was as alleged in the com-
plaint, and that he had not been paid.

At the conclusion of the evidence the court charged the jury
that no verdict could be rendered against the defendants A. F.
and O. A. Caldwell because they had not been served with
process and directed them to return a verdict in favor of the
defendant Hanson because her name had been signed to the
agreement without authority, and in favor of defendant Blair
because he had sold and parted with his interest prior to the
employment of the plaintiff and the rendition of his services.
The court directed a verdict in favor of plaintiff and against
the defendant, Brossard. As to the liability of the defendants
West and R. A. Caldwell, the court submitted the case to the
jury on instructions that, if they found the defendants were
partners, to render a verdict for the plaintiff against those two
defendants also; otherwise to find in their favor. The jury
found in favor of defendants West and R. A. Caldwell; hence
this appeal by plaintiff from that part of the judgment.

Among other instructions the court charged the jury as fol-
lows:

"(5) Partnership is thus sometimes defined as the rela-
tion existing between two or more persons who have contracted
together to share as co-owners the profits of a business carried
on by all or any of them on behalf of all of them. You are

further instructed that, where the business so engaged in is the working of a mine or of a mining prospect to test its value under an option to purchase it, a mining partnership exists, and that such partnership may be created by the acts of the parties without an express contract formally designating themselves as partners. Two things are necessary to create a mining partnership: (a) An agreement between the parties to so associate themselves together to work the property; and (b) actually undertaking the work of mining operations thereon. It is not necessary under such circumstances that the parties should be the owners of the legal title to the property to constitute them mining partners.

"(6) If you find by a preponderance of the evidence that the defendants, or any of them, so associated themselves together for the purpose of causing mining operations upon the property described in the complaint, and co-operated for that purpose, the profits of the business, if any, to inure to all as co-owners and to be shared accordingly, and by authority of those so associated, actual working of the property was in fact carried on, then a mining copartnership was created between the defendants so associating and co-operating, and they would be liable for the debts incurred in carrying on such mining operations."

"(9) You are instructed that a member of a mining partnership has full power to make such contracts as are usual and and necessary in the ordinary course of working a mine, such as to purchase supplies and materials for working the mine, and to employ the necessary help in carrying on its operations, and the right to incur debts for necessary supplies furnished to the mine, and for the payment of the laborers and other employees necessarily engaged therein, and all the members of the mining partnership are bound by his acts as to all such matters.

"(10) You are instructed that a superintendent, foreman, or managing agent of a mining partnership, when duly authorized by the partnership or one of its members, has authority to bind them by his acts in carrying on the working of the mine, in the employment of laborers and other necessary em-

ployees, and in purchasing supplies and materials for actual use in the working of a mine. You are further instructed that when a mining partnership in fact exists it is not necessary that a creditor furnishing supplies or materials for the working of the mine, or a laborer or other employee working therein, should know the names of all the partners; but when such a partnership is shown to exist by competent evidence all the partners are bound for the claims of the rightful creditors of the partnership, whether such creditors know they are partners or not."

"(12)  You are instructed that when a mining partnership has been proven to exist any special limitation upon the powers of the partners, which they attempt to make by agreement among themselves, does not affect or restrict the power of each partner to bind the partnership in the usual course of business, except as to persons who know of the limitation, and the burden of showing knowledge of such alleged limitation is upon the parties claiming it."

The jury were further instructed that in ascertaining whether the relation of the defendants constituted a partnership they should consider all the facts and circumstances, and if, from a consideration thereof, they found "that there was no intent on the part of said defendants to enter into a co-partnership relation, and that such relation did not exist between them, or any of them, and the defendant Bossard, then the court charges you that your verdict must be in favor of the defendants Jacob West and R. A. Caldwell." The court further instructed the jury that the written agreement between Brossard and the other defendants did not in and of itself constitute a partnership; that the fact that the defendants contributed to the expenses connected with operating the group of mines was not in and of itself proof of partnership; that the fact that the defendants, under certain circumstances, were to share in the profits, if any, to be derived from the operation of the mines, was not in and of itself sufficient to prove partnership; and that the payment of money by the other defendants to the defendant Brossard to be used in the development

of the mining property did not in and of itself, and independently of other proof, constitute the relation of copartners.

Various assignments of errors are made, among them that the verdict is contrary to the evidence, and is against the law, and that the court erred in charging the jury that the written contract of the defendants did not constitute the relation of partnership; in charging that a verdict must be rendered in favor of the defendants West and R. A. Caldwell, unless the relation of partnership was found to exist; in charging that the contributions made by the defendants to defray the expenses in operating and working the group of mines, and the payment of money by them for the development and carrying on the workings and operations of the property, and the agreement to share in the profits, if any, by the defendants, resulting from such operations, did not constitute a copartnership; and in admitting certain testimony of the defendants that they never received any money or profits, or a conveyance, or other thing of value, from Brossard in pursuance of their contract, and that they gave Brossard no directions as to the employment of men or the conduct of the work.

The principal questions involved have, to a large extent, been discussed together by counsel in their briefs and in the oral argument. It is not necessary for us to review these questions separately. We are of the opinion that the court erred in charging the jury that the written contract of the defendants did not constitute the relation of partnership. It is not essential to inquire into the requisites of a general or trading partnership beyond the principles of law which are in common with such a partnership and a mining partnership. As to the general principles involved, and particularly applicable to the case, we find no better statement of the rule than that of Mr. Justice Gray in the case of *Meehan v. Valentine,* 145 U. S. 611, 12 Sup. Ct. 972, 36 L. Ed. 835, as follows:

"The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits."

After reviewing the authorities it was further observed by him:

"In the present state of the law upon this subject it may perhaps be doubted whether any more precise general rule can be laid down than as indicated at the beginning of this opinion, that those persons are partners who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions. If they do this, the incidents or consequences follow that the acts of one in conducting the partnership business are the acts of all; that each is agent for the firm and for the other partners; that each receives part of the profits as profits, and takes part of the fund to which the creditors of the partnership have a right to look for the payment of their debts; that all are liable as partners upon contracts made by any of them with third persons within the scope of the partnership business; and that even an express stipulation between them that one shall not be so liable, though good between themselves, is ineffectual as against third persons. And participating in profits is presumptive, but not conclusive, evidence of partnership."

It is sometimes said that an obligation to share losses is an essential element to the existence of a partnership. While an obligation to share losses is not directly expressed in the agreement, still it has been quite generally held that an agreement to share profits, nothing being said about losses, amounts *prima facie* to an agreement to share losses also. (1 Lindl. on Partn. [Ewell Ed.], 30. The contract executed by the defendants recites: "That whereas the first party [Brossard] has leased from L. Fannof mining claims [naming them]; and whereas it is deemed advisable and agreed by the parties hereto that the sum of $5,000 shall be furnished for the development of said mining claims and the carrying out of the said contract when completed by the first party therein, and the said L. Fannof for the development of the said mining claims, and for earning and securing the option in said contract set forth: Now, therefore, it is hereby agreed by the parties hereto, etc." It is thus seen that the lease between Brossard and Fannof was not only the inducement for the making of the contract between the defendants, but was the very subject-matter of their agreement, and, by sufficient reference, was in effect made a part thereof. To therefore arrive at a correct meaning of the defendants' contract, and to properly understand it, it must be read in connection with the lease. The object of entering into their contract

was to work and develop the group of mines in accordance with the terms of the lease, and for the purpose of obtaining whatever benefits and advantages that might be derived therefrom. Such was the adventure undertaken by them and the purpose for which they associated themselves together. Their undertaking to develop and work the property was not for the benefit of Brossard alone, but was for the common benefit of all the parties to the contract. They, then, agreed as to the amounts of money that should be contributed by each. Each party was to receive a pro rata share of the moneys derived from the sale of ores over and above the expenses of operation, and in proportion to the amount contributed by each; and likewise each was to share in like proportion to an interest in and to the property itself in the event of a successful operation and of earning and securing the option provided for in the lease. They, therefore, had a community of interest in whatever profits that were to be obtained. We thus have every requisite of a partnership, and a case where the parties in clear and unambiguous terms have, in the language of Mr. Justice Gray, joined together on an adventure, for their common benefit, each contributing money and having a community of interest in the profits. When the writings are read, how can it be said that these defendants did not join together upon an adventure to work and develop the group of mines mentioned in the lease and under the terms and conditions as therein specified? That such joining together was not for their common benefit? That the contributions made were not for the purpose of working and developing the claims, of obtaining whatever ores that might be found from the explorations, of acquiring an interest in the property, if found valuable, and were not in furtherance of the very objects for which the parties associated themselves together? That they did not have a community of interest in whatever profits to be derived from the adventure? The terms of these contracts were precise and explicit. The language was clear and unequivocal. There was nothing doubtful or ambiguous about them, which required explanation by resorting to extraneous circumstances. The

court ought to have held that the agreement of the defendants created the relation of partnership.

When the trial court permitted the jury to determine from all the evidence and circumstances whether the defendants had intended to assume the relation of partnership towards each other, it also committed error. True it is sometimes said that to constitute a partnership the parties must have intended to create such relation.

"But," as was said by the court in the case of *Fleming v. Lay*, 109 Fed. 952, 48 C. C. A. 748, "by this it is meant to say they must have intended to make such stipulations as in law constitute a partnership, and not that they intended the conclusion without regard to the conditions upon which it results as matter of law." And, as said by Mr. Lindley in his work on partnership, "if they have in fact stipulated for all the rights of partners, an agreement that they shall not be partners is a useless protest against the consequences of their real agreement." (1 Lindl. Partn. [5th Ed.] 11.)

Counsel for respondent has strongly urged that "there was no common partnership nor joint proprietorship in the business;" that Brossard alone had an interest in the lease; and that the respondents had no present estate or interest in the lease or in the claims, and that they had only the promise of Brossard to do something in the future. We need but to refer back to the statement of the rule as made by Mr. Justice Gray as to the requisites of a partnership to point out the fallacy of counsel's position. To be a partner one must of course have an interest in carrying on the business or adventure, and must have a common ownership of, or a community of interest in, the profits of the business. While a community of interest in the profits is not alone conclusive of the existence of a partnership, it nevertheless is of the very essence of the contract of partnership, for without it a partnership cannot exist in contemplation of law. Furthermore each party here had, not only an interest in carrying on the business or adventure, but also a common ownership in the business itself. Though the lease was in the name of Brossard alone, nevertheless the contract of the defendants, as between themselves, had the effect of an equitable assignment of the lease, and gave each of the parties to the contract

an equitable interest in the lease as fully as though an express agreement had been made by the parties that Brossard should obtain the lease in his own name, for the use and benefit of all of the parties. Under the arrangement of the parties, had large and valuable ore bodies been found and the proceeds thereof had exceeded the expenses of operation, equity would have given all the parties to the contract an interest therein, and would have compelled Brossard to account to his codefendants therefor; and, if sufficient proceeds over and above expenses had been obtained to earn the option according to the provisions of the lease, equity likewise would have given them an interest, in accordance with the terms of their contract, in and to the property itself. The provision in the lease that Brossard should not sublet nor assign it without the consent of Fannof in writing was for the benefit of Fannof. It could not be made available by Brossard, as between himself and his codefendants, in a refusal to account for the proceeds, or to otherwise carry out his contract with them. The position of counsel is rendered still more untenable when it is considered that the kind of partnership created by the defendants was that of a mining partnership. In 27 Cyc. 755, it is said:

"A mining partnership arises when two or more co-owners of a mining claim actually engage in working the same, and share, according to the interest of each, in the profit and loss, although there is no express agreement between them to become partners, or to share the profits and losses. Such a partnership is not restricted, however, solely to cases where the mine is owned by the parties working it, if they have an interest in working it or in carrying on mining operations. It can be formed either to prospect for and locate mines, or to work mines belonging to other persons, or to any or all of the individual members."

In speaking of mining partnerships, Mr. Lindley, in his work on Mines (volume 2, section 798), says:

"Such a partnership may exist as well where the parties have an interest in the working of the mine in carrying on mining operations as where they own the mine itself."

In 2 Snyder on Mines, section 501 et seq., is found a full discussion of what constitutes a mining partnership, the dis-

tinction between such a partnership and a co-tenancy, or an ordinary trading or general partnership. See, also, notes to case of *G. V. B. Min. Co. v. Bank,* 95 Fed. 35, 35 C. C. A. 515. In the case of *Manville v. Parks,* 7 Colo. 128, 2 Pac. 212, the question was directly before the court. It was there said:

"It is evident that a mining partnership may exist as well where the parties have an interest merely in the working of a mine, or in carrying on mining operations, as where they own the mine itself."

To the same effect are the following cases: *Meagher v. Reed,* 14 Colo. 335, 24 Pac. 681, 9 L. R. A. 455; *Hartney v. Gosling,* 10 Wyo. 346, 68 Pac. 1118, 98 Am. St. Rep. 1005; *Ashenfelter v. Williams,* 7 Colo. App. 332, 43 Pac. 664; *Settembre v. Putnam,* 30 Cal. 490; *Dunlap v. Pattison,* 4 Idaho 473, 42 Pac. 504, 95 Am. St. Rep. 140; *Southmayd v. Southmayd,* 4 Mont. 100, 5 Pac. 318; *Haskins v. Curran,* 4 Idaho 573, 43 Pac. 559. The facts in the case of *Meagher v. Reed, supra,* are very similar to the facts of the case in hand. There Meagher obtained a lease from the owners of the claims in his own name. The property was worked under the lease, and developed by himself and his associates, who had no interest whatever in the properties, except as they had an interest in the lease through an agreement with Meagher, and because thereof were interested in the working of the mine and the profits to be derived therefrom, and were to acquire undivided interests therein in case of successful development and operations. True Meagher had agreed to assign an undivided interest to his associates in and to the lease when obtained from the owners, while here there was no such express agreement on the part of Brossard, but where nevertheless his contract with his associates operated as an equitable assignment of an interest in the lease and gave them an equitable interest therein. At any rate, by Brossard in his contract with his associates agreeing to convey to them specified undivided interests in and to the mining property itself acquired in pursuance of the lease, and to pay to them pro rata shares of the proceeds of ores over and above expenses, gave them an interest

in and to the claims and the business quite as much as though he had merely agreed to assign to them an interest in the lease, and certainly gave them an interest in the working of the properties and in carrying on the mining operations. From the foregoing authorities it will thus be seen that the rule is well established that a mining partnership may exist between persons, although all of them may not have a direct or present interest in and to the properties themselves if they have an interest in the working of the property or in carrying on the mining operations. It is not even essential that there should be an express agreement to become partners, or an express stipulation to share profits and losses, as that is an incident to the prosecution of the general business. (*Duryea v. Burt,* 28 Cal. 569; 2 Lindl. on Mines, section 797.)

Again, referring to the contract of defendants, it seems quite clear that they associated themselves together to work and develop the group of mines in question for their common benefit; that each had an interest in and to the lease, and in working and developing the properties, and in carrying on the mining operations; and that each had a community interest in whatever profits that were to be derived from such operations. The agreement, under all the authorities, contains every requisite of a mining partnership. Quite true a distinction is made, and is well recognized by the cases and the textwriters, between such a partnership and an ordinary trading or general partnership. The principal distinctions are that a member of a mining partnership may assign his interest without the consent of his copartners, and the act does not work a dissolution of the partnership; that the person to whom the interest is assigned becomes a member of the company, and it is not necessary that the other parties consent thereto. Neither does the death of a member dissolve the partnership. Another distinction is that a member of a mining partnership has not the power to bind his associates by engagements with third persons to the extent that a member of a trading or commercial firm may do. For instance, the law does not imply any authority to a member of a mining partnership to borrow money, to employ counsel, to execute a

promissory note, or to draw or accept bills of exchange, no natter how pressing the necessity for the use of the money. The reason assigned for the distinction, and for limiting the powers of members of a mining partnership, is that such a partnership, is not founded on the *delectus personae,* whereas other partnerships are. For these reasons it is held that the powers of members or managers of mining partnerships are limited to the performance of such acts in the name of the partnership as may be necessary to the transaction of its business, or which are usual in like concerns. But a partner can bind the firm by acts in the name of the partnership in such matters as may be necessary to the transaction of the business, or which are usual in like concerns, unless there is an express agreement to the contrary known to the party contracting with the firm. Except as to these distinctions, the law governing a mining partnership is not different from that applicable to ordinary commercial or trading partnerships. (2 Snyder on Mines, section 1526; 27 Cyc. 557-559; *Skillman v. Lachman,* 23 Cal. 199, 83 Am. Dec. 96; *Kahn v. Smelting Co.,* 102 U. S. 641, 26 L. Ed. 266; *Manville v. Parks, supra; Meagher v. Reed, supra; Charles v. Eshleman,* 5 Colo. 107.) The employment of the plaintiff by Brossard to do labor on the property was necessary to the transaction of the business, and was usual in like concerns and was therefore within the implied powers of Brossard, and was binding on the other members of the firm. In that regard it may here be said, as was said by the court in *Manville v. Parks, supra*:

"In this case the articles purchased of the plaintiff were essential to the carrying on of the business and the accomplishment of the purpose of defendants in working the mine, and the debt being created in the necessary and usual course of the business, and within the scope of the partnership adventure, the individual member who made the purchase had lawful authority to contract the debt, and to bind his copartners thereby."

And it must here be held, as was held in the case of *Lyman v. Schwartz,* 13 Colo. App. 318, 57 Pac. 735, that one member of a mining partnership has authority to employ laborers to

work the mine and to bind the partnership for their wages.

It is also said by counsel that Brossard had the active management of the properties; that he employed the labor and purchased the material, directed and controlled all the work and operations at the mines; and that the respondents had not given him any authority or direction with regard to such matters. From this it is argued that the respondents were not principals in the business; that the relation of agency did not exist between them and Brossard, and therefore no partnership relation existed between them. As pointed out in the cases of *Pooley v. Driver,* 5 Ch. Div. 458, and *Meehan v. Valentine, supra,* the reference to agency as a test of partnership, as made in some of the cases, "was unfortunate, inasmuch as agency results from partnership, rather than partnership from agency." Says Mr. Justice Gray: "Such a test seems to give a synonym rather than a definition; another name for the conclusion, rather than a statement of the premises from which the conclusion is to be drawn." The proving of agency, as must be readily conceded, does not prove a partnership. But from the proof of partnership agency at once results. It is a sort of agency of one person acting on behalf of the firm.

"He does not act as agent, in the ordinary sense of the word, for the others, so as to bind the others. He acts on behalf of the firm of which they are members; and as he binds the firm, and acts on the part of the firm, he is properly treated as the agent of the firm." (*Pooley v. Driver, supra.*)

Nor is the fact that Brossard had charge of the work and employed the labor and purchased the material significant or controlling under the circumstances of the case in determining whether the mining operations carried on were his individual business or the joint business of himself and associates, for such delegation of power to a general manager or common agent is not an infrequent incident of the business of partnership. That the working of the mine was not his individual business, and the carrying on of the mining operations was not alone for his benefit but for the common benefit of all the parties to the contract, is conclusively shown by all the evidence.

But aside from the consideration of the question that the court erred in instructing the jury that the contract of the defendants did not constitute a partnership, we think that the verdict of the jury was contrary to the evidence, and against the law of the case as given them by the court. In paragraph 5 the court charged the jury that where the business engaged in is the working of a mine or of a mining prospect to test its value under an option to purchase it a mining partnership exists and that such partnership may be created by the acts of the parties without an express contract designating them as partners; that two things are necessary to create a mining partnership (a) an agreement between the parties to associate themselves together to work the property, and (b) actually undertaking the work of mining operations thereon. And in other portions of the charge hereinbefore referred to, the court instructed the jury that a member of a mining partnership had the authority to employ necessary help in carrying on the operations, and to incur debts for the necessary supplies and material furnished, and that as to such matters all the members of a mining partnership were bound. Upon the facts assumed by the court, and upon which he told the jury that a mining partnership resulted, and as to the matters concerning which one member could bind his copartners, there was no conflict in the evidence. Upon these instructions and upon the evidence there was but one verdict to be rendered by the jury, and that was a verdict in favor of the plaintiff, not only against Brossard, but against West and R. A. Caldwell as well. Plaintiffs employment by Brossard, and the rendition and value of his services, were conceded by all the defendants. Likewise there was no dispute that the defendants associated themselves together to work the property, or that they actually undertook the work of mining operations thereon. It appears from the testimony of the respondents themselves that they contributed the money to work and develop the mines, to carry out the lease between Brossard and Fannof, to test the value of the properties, and to obtain whatever benefits might be derived from such workings and operations. The verdict which the jury rendered in favor of the defendants West and

Caldwell was in the very teeth of these instructions, and contrary to all the evidence. It was the right and duty of the court to instruct the jury in matters of law; and the jury, as matter of duty, were bound to follow it. If an instruction is wrong, the law assumes, as a necessary legal consequence, that the verdict is wrong, and sets it aside; but to permit a jury to exercise their own judgment, and to decide contrary to the direction of the court, is to create confusion and uncertainty in the law and to govern a case, not by known and established rules, but by a rule made for the occasion, and left to the whims and caprices of jurymen. Instructions to a jury are the law of the case for them to obey and follow, and it makes no difference whether they consider them correct or not, or whether in point of fact they are correct. The court on the motion for a new trial should have set the verdict aside, and erred in not doing so.

For the foregoing reasons, the judgment of the court below is reversed, and the cause remanded for a new trial, costs to appellant.

FRICK, J.

I concur.

McCARTY, C. J. (dissenting).

Plaintiff brought this action to recover from defendants the sum of $212 alleged to be due for labor performed on certain mining claims situated near Tuscarora, Nevada, known as the "Wakefield Group." It is alleged in the complaint that the defendants, on or about March 11, 1903, at Logan City, Utah, entered into a contract in writing whereby they associated themselves together as mining partners for the purpose of developing and operating the group of mining claims mentioned, and that the defendants thereupon jointly entered upon the work of developing and operating said mining property under said contract of partnership; that plaintiff was employed by the defendants as an engineer to work upon said mining claims; and that he performed work thereon between August 1, 1903, and September 23, 1903, and that there is due him

33 Utah—27

the sum of $212. The defendants who were served with process answered and denied the existence of the partnership.

It appears from the record that in October or November, 1902, at Tuscarora, one L. Fannof, who was the owner of said group of claims, agreed to lease them to A. Brossard, one of the defendants in this action. A draft of the lease was drawn up at that time, but not signed by the parties until December 13, 1902. The lease, which was for an indefinite period, provided, among other things, that Brossard should employ and keep at work six men a specified number of hours each day developing the property. It was further provided that the money, if any, derived from the sale of ore extracted from the mines during the life of the lease, should be deposited with the First National Bank at Logan, Utah, subject to the draft or check of Brossard as manager of the "Wakefield Mine." It was also stipulated that this money should first be expended by Brossard in defraying the expenses of the mine, and the balance, if any, should be allowed to remain and accumulate in said bank, and that when the money thus accumulated, after paying all expenses, amounted to $20,000, it should be equally divided between A. Brossard and L. Fannof. It was further agreed that Fannof would then convey to Brossard, by a good and sufficient deed, an undivided one-half interest in the group of mines in question. It was also agreed that Brossard should have an option to purchase said one-half interest in the property at any time during the life of the lease by paying therefor "the sum of $10,000 of his own individual funds, . . . and that in such event any moneys that may have accumulated in said bank over and above the expenditures . . . shall be equally divided between the parties." It was further provided in the lease that Brossard should neither sublet nor assign the lease without first obtaining Fannof's consent in writing. It was also provided that when steam power was used to operate the machinery of the mine Fannof should be "employed as first engineer at the current wages paid for such work in Tuscarora mining district." (The record shows that steam power was used, and that Fannof was employed as an engineer.) It was further provided in the lease that if

Brossard desired at any time to stop work on the property and to terminate the lease he could do so, and the money on deposit in the bank, if any, derived from the sale of ores taken from the mines, after the payment of all expenses of development, should be divided equally between the parties.

This leasee, which was written out, but, as stated, not signed, was taken by Brossard to Logan City, Utah, where most of the other defendants resided, and there presented to them with the proposition from Brossard that, if each of them would contribute a certain sum of money to be used by Brossard in the development of the mining claims covered by his lease, he, in return for the money so contributed, would, at some future time convey to each of the parties contributing an interest in the property, provided he should, with the funds thus furnished him, succeed in making of the adventure a paying concern. This proposition was accepted by the other defendants, who immediately paid to Brossard $5,000. Brossard soon thereafter returned to Tuscarora, and he and Fannof signed the lease, a draft of which he had, as stated, shown to the other defendants. Brossard immediately thereafter took possession of the leased property, and, with the money he had received from his co-defendants, put up machinery, employed men, and began active operations thereon. The work consisted of sinking shafts, running tunnels, and making crosscuts in search for ore. About March 1, 1903, the funds which Brossard had received under the contract became exhausted, and he called upon the parties who had paid him the $5,000 for more money, and they again paid him $2,000. On March 11, 1903, an agreement containing the terms and conditions upon which the money was paid Brossard was drawn up and signed by him and the other defendants. The agreement so far as material here, is set out in the prevailing opinion in this case. Contributions other than those mentioned in the agreement were made by the parties, the last of which was made about June 30, 1903. Brossard called on the parties for more money in July, 1903, but they failed to make any further payments. The entire amount contributed under the agreement was about $10,000. Brossard kept men at work on the prop-

erty until September 23, 1903, but failed to find any ore, and was compelled, for the want of funds, to abandon the work and to throw up his lease. It appears that the expenses of working and operating the mines during the months of August and September were not paid.

The action was tried to a jury, who returned a verdict in favor of plaintiff and against A. Brossard, and against plaintiff and in favor of the defendants Jacob West and R. A. Caldwell, "no cause of action." The court directed a verdict in favor of Mattie B. Hanson and J. M. Blair. The defendants A. F. Caldwell and O. A. Caldwell were not served with summons, and did not appear in the action. This appeal is prosecuted against the defendants, Jacob West and R. A. Caldwell only.

Appellant bases his right to recover from respondents on the ground that they were copartners with defendant Brossard in the said mining operations, and that the services in question were rendered for the copartnership. The court instructed the jury that the written agreement between A. Brossard and the other defendants did not create the relationship of copartners between them. Appellant assigns the giving of this instruction as error. It might be well to observe that respondents concede that the services referred to were rendered, and that the sum sued for is justly due appellant. Respondents, however, contend that Brossard alone was liable for the debt. The only question, therefore, presented by this appeal is, did the relationship of copartners exist between Brossard and the respondents at the time the labor in question was performed? A partnership is defined to be

"A business relation between two or more persons arising out of a contract by which they agree to unite their property, credit, skill, or influence in some business so that they may have a community of interest in such business, and usually divide the profits and losses between themselves in fixed proportions." (2 Page on Contracts, 937.)

In the case of *Beecher v. Bush,* 45 Mich. 188, 7 N. W. 785, 40 Am. Rep. 465, Judge Cooley, in the course of an able and elaborate opinion, says that a partnership is "a community of interests in some lawful commerce or business, for the conduct

of which the parties are mutually principals of, and agents for, each other."

Some of the elements necessary to a partnership are wanting in the agreement entered into between Brossard and his codefendants. There was no evidence introduced that tended to show that it was the intention of the parties to the agreement to form a partnership, nor do I think such intention can be reasonably inferred from the terms of the contract, especially when read and construed in connection with the lease. The agreement when thus read shows conclusively that neither respondents nor any of Brossard's other codefendants acquired any interest whatever in the lease. The consideration, and the only consideration received by the parties for the money paid to Brossard under the contract, was his promise that he would, in case the venture proved a financial success, refund the money, deed to each of the parties a specified interest in the property, and pay to each a certain proportion of the fund provided for by the terms of his lease. Brossard was in no way subject to the control or dictation of respondents and the other defendants respecting the employment of laborers at the mine and the expenditure of the money in purchasing machinery and supplies necessary to the successful prosecution of the work under the lease. And neither respondents nor any of Brossard's other codefendants had any authority to contract for or to purchase supplies to be used in operating the mines and to pay for the same by drawing against the funds which they had paid to Brossard. Their contract gave them no right whatever to direct how the money should be expended, or in what particular way the work should be prosecuted. They had no right to even go upon the property and enter the underground workings thereof without Brossard's consent. Nor could they compel him to suspend operations when the money paid him was exhausted. And they could not have prevented him from incurring the indebtedness for which they are sought to be held liable in this action. In fact, they had no more legal right under the contract to direct how the money should be expended, or how the work under the lease should be performed or prosecuted, than if they were not parties to the

agreement, but were strangers to the entire transaction. True it is said in the opinion written by Mr. Justice Straup that "plaintiff (appellant) also gave evidence tending to show that he was employed at the instance and request of Brossard and R. A. Caldwell." I do not so construe plaintiff's testimony when read in its entirety on this point. He said: "I know A. Brossard. Became acquainted with him in 1902. He . . . asked if I was an engineer, and if I would go to work for him. I also know R. A. Caldwell. Became acquainted with him about June or July, 1903. He (Caldwell) came over to the mine where I was at work (referring to the mine covered by the lease)." Again he says: "I was employed by A. Brossard to work on the Wakefield group of mines about January 10, 1903." On cross-examination he stated: "I did not nor do I know now who are the owners of the Wakefield group of mining claims, but understood that I was employed by A. Brossard, R. A. Caldwell, and others furnishing the money for the same. From R. A. Caldwell I received my information at different times between the months of July and September, 1903 (this testimony was denied by Caldwell); from Mrs. A. Brossard in the month of July, 1903." He named several other persons from whom he acquired this information, none of whom are parties to the suit. Therefore I think his own evidence conclusively shows that he was not employed at the instance of R. A. Caldwell. He had been at work for Brossard five or six months before he met or became acquainted with Caldwell. The record further shows that the business was all done by Brossard in his own name. Another significant fact is that respondent's and Brossard's other codefendants made their last payment June 30, 1903. Soon after this payment was made R. A. Caldwell came to Tuscarora and examined the property covered by the lease. He went into the mine twice and examined the underground workings. The evidence introduced on behalf of appellant shows that Caldwell stated to one Hobson, who was employed at the mine as timekeeper and bookkeeper, that he (Caldwell) "had put up money for the development of the Wakefield group of mines, . . . and that he had put up

his last dollar for such work." This alleged conversation took place long before the indebtedness involved in this case was incurred. Notwithstanding Caldwell remained continuously in Tuscarora until after Brossard had abandoned his work and left the camp, neither appellant nor any of the other employees at the mine suggested to him that they intended to hold him responsible for their wages. In fact the only demand ever made on respondents by appellants was the bringing of ·this action.

The obligations created by the agreement were not joint, as appellant seems to contend, but several; that is, the amount that each of Brossard's codefendants was to contribute, and the interest each party was to receive in the property, was fixed by the agreement. Neither of Brossard's codefendants acquired any right or interest in the contribution of any other defendant, nor in any of the benefits to be derived therefrom, as stated by counsel for respondents in their brief, "the relationship among the defendants was as separate and several in character as if each of the defendants, with the exception of Brossard, had entered into a separate and distinct contract with him." When one of the parties to the agreement paid the amount he had covenanted to pay, the contract on his part was fully performed, and neither Brossard nor any of the other defendants had any further claim against him. And on the other hand, when the money advanced by the parties was all spent, and they failed to further contribute, Brossard's obligations to them under the agreement likewise terminated, and the contract gave him no authority to continue the work on the credit of his codefendants. That such was the legal effect of the agreement is plain, because, as stated, Brossard's right to the possession of the property and to carry on the development work was derived from his lease from Fannof, and in no way depended upon his agreement with respondents. This lease he could not assign, neither could he sublet the property covered by it without the written consent of Fannof. By the terms of the lease Brossard was bound to keep a certain number of men at work on the property during the life of the lease, and when steam power was used to run the machinery of the mines Fan-

nof was to be employed as chief or head engineer.  These terms and conditions were fully understood by the other defendants when they entered into the contract in question with Brossard.  They knew that under  the terms of the lease the voluntary suspension of the work for any appreciable length of time gave Fannof the right to terminate the lease, and to repossess the property.  Therefore it necessarily follows that Brossard, in operating the mines under the lease, could not, in any sense, have been the representative or agent of the defendants, for as I have stated, they had no interest whatever in the lease.  And furthermore Brossard could not, without the written consent of Fannof, which was not obtained, assign an interest to them.

The doctrine is fundamental that in a partnership each partner is an agent of his copartners in all matters pertaining to the affairs of the partnership, and has implied authority to bind the firm in all matters within the scope of the business in which it was engaged.  This principle is well illustrated by Mr. Parsons in his work on Partnership, section 83, in the following language:

"The principle which lies at the foundation of the partners' liability is that every partner has full and absolute authority to bind all the partners by his acts or contracts, in relation to the business of the firm, in the same manner and to the same extent as if he held full powers of attorney from all the members.  No principle is better established than this.  It rests, not only on universal authority, but on obvious reason and necessity; because, if the rule were otherwise, a very large proportion of the advantages and facilities for which partnerships are formed would be lost."

Tested by this doctrine, which is undoubtedly founded upon correct principles, it is plain that the agreement entered into by Brossard and the other defendants did not create the relationship of partners between them.  (*Beecher v. Bush, supra; Loomis v. Marshall,* 12 Conn. 69, 30 Am. Dec. 596.)

By an examination of the cases cited in the opinion written by Mr. Justice Straup it will be seen that they adhere to and declare this same doctrine.  If, however, the construction contended for by appellant of the contract under consideration

is to be adopted, and followed in this case, then we have here a partnership in which five of the six members comprising the firm had no voice whatever in conducting and carrying on the business of the partnership. They could not severally or collectively exercise any supervision over the other partner (Brossard) in his management of the business. In fact, as I have hereinbefore stated, they did not have the right to even go upon the property to inspect the work as it progressed except by consent of Brossard. In other words, they were only so many figureheads or dummies in the alleged partnership without any of the rights or privileges pertaining to the management and the carrying on of the partnership affairs with which the law clothes the several members of a partnership. In the opinion written by Mr. Justice Straup, it is said: "Furthermore, each party here had, not only an interest in the carrying on of the business or adventure, but also a common ownership in the business itself." Now, if each party "had a common ownership in the business," he acquired it by virtue of the lease and the contract entered into between himself, Brossard, and the other defendants. It could not have been by virtue of the lease, because the lease itself prohibited Brossard from parting with his interest or any part thereof without the written consent of Fannof, and this he did not obtain. The contract between Brossard, respondent, and the other defendants did not make them common owners in the business, because, as stated in the prevailing opinion, "it (the contract) must be read in connection with the lease." It is further said in the opinion that, "though the lease was in the name of Brossard alone, nevertheless the contract of the defendants, as between themselves, had the effect of an equitable assignment of the lease, and gave each of the parties to the contract an equitable interest in the lease." This, however, cannot be so. The contract between Brossard and his codefendants provided that in case he (Brossard) should acquire title to an interest in the property as provided in the lease, he would, in consideration for the money furnished him, convey to each of the other defendants a specified interest in the property, and then prorate between them the $10,000

he was to receive as his portion of the accumulations provided for in the lease. That neither Brossard nor respondents could have intended that they should acquire an interest in the Fannof lease is plain, because the provisions of the lease itself, as stated, precluded them from acquiring an interest therein. If Brossard at any time had quit work, neither respondents nor any of the other codefendants could have gone into possession of the property and continued the work of development and thereby prevented a forfeiture of the lease by Fannof. To illustrate: Suppose that after Brossard had taken possession of the property and commenced work thereon in conformity with the terms of the lease, Fannof had refused to permit him to continue in possession of the property, and had ejected him therefrom, and Brossard had brought suit to recover possession of the mining claims, is it not plain that respondents would have been neither necessary nor proper parties to the action? Why, certainly. All of which is incompatible with the theory advanced and claim made that respondents, by virtue of their contract with Brossard, acquired an equitable interest in the lease, and had a common ownership in the business.

There was some evidence introduced at the trial which tended to show that during the time appellant was at work on the mining claims in question respondent R. A. Caldwell visited the property and on several occasions stated to appellant that the work was being performed for himself and the other parties who had put money into the enterprise. This testimony, as hereinbefore stated, was denied by Caldwell, and the jury, by their verdict, found against appellant on this point, and this court is concluded by the finding.

Reference is made to the fact that after Brossard had thrown up his lease and quit work Fannof met with respondents and others who had furnished funds with which to enable Brossard to carry on the work under his lease, and that there was some talk of organizing a corporation for the purpose of paying off the debts incurred by Brossard and to further develop the property. This, however, is no proof of the existence of a partnership, nor is it a circumstance tending to

show that there was any intent on the part of the parties to form a partnership. Fannof, no doubt, was anxious to get what was due him from Brossard for work performed under the lease. At that time it had not, in effect, been judicially determined that notwithstanding respondents had nothing whatever to do with hiring Fannof, and were powerless to prevent his employment, nevertheless they are liable to him for the balance due on his wages; for it necessarily follows that, if respondents are liable to appellant for the balance due him for work on the mines covered by the lease, they are also liable to Fannof for the balance due him for his work.

Council for appellant, in their brief, have assumed that by the terms of the agreement Brossard and the other defendants were to share in the profits should any be realized from the undertaking; and upon this premise they have based the major part of their argument in support of their contention that the parties intended to, and did in fact, form a copartnership for the purpose of developing the mines in question, and ultimately acquiring an interest therein. I do not think the agreement is open to this construction. As I have hereinbefore pointed out, Brossard, in consideration of the money advanced by his codefendants, agreed to convey to each of them an interest in the property covered by his lease, repay the money so advanced, and to pay to each a certain proportion of the $10,000 he expected to receive as his share of the fund provided for in his contract with Fannof. In other words, Brossard agreed to sell, and each of the other parties to the contract agreed to purchase, a specified part of his (Brossard's) interest in the property when acquired by him under his agreement with Fannof. Suppose, for example, that the business had proved successful, and the hopes and anticipations of all the parties concerned respecting the productiveness of the property had been fully realized, and Brossard, on receipt of the title to a one-half interest in the property and the $10,000 mentioned, had refused to convey to each of the parties who had contributed to the fund and made it possible for him to develop the property an interest in the property, and had refused to pay to each a

part of the $10,000 as provided in the agreement, is it not apparent that an action for specific performance of the contract would lie against him and in favor of each of the parties with whom he refused to settle? The agreement gave the respondents no interest whatever in the $20,000 accumulations provided for in the contract between Brossard and Fannof until after the distribution of this fund between Brossard and Fannof. Therefore, as I construe the agreement, no provision was made therein for the sharing of profits between Brossard and the other defendants, and the question of profits is in no way involved in the case.

The distinguishing features between mining and commercial partnerships are pointed out and elaborately discussed in the prevailing opinion. I recognize the difference between the two kinds or classes of partnerships as therein pointed out, but, as I view the case, these questions are not before us; that is, they are not involved in the case. No claim is made that because some of the parties to the agreement disposed of and assigned their interests therein to third parties the partnership, if one was created, was thereby dissolved. The important question presented by this appeal is, did the contract, when read and construed in connection with the lease, create the relationship of partners between Brossard and respondents? In the following cases the construction of contracts similar in character to the agreement under consideration was involved, and it was held in each case that a partnership was not created between the parties to the contract: *Blair v. Schaeffer* (C. C.), 33 Fed. 218; *Seymour v. Freer,* 8 Wall. (U. S.), 202, 19 L. Ed. 306; *Adams v. Funk,* 53 Ill. 219.

In the case of *Blair v. Schaeffer* the contract in part provided that: "Whereas, by virtue of a certain contract made by Samuel C. Schaeffer . . . with P. Cardenas . . . for the purchase of 36.47 acres of land in Jackson county, Missouri, . . . for which . . . Schaeffer was to pay the said Cardenas the sum of $21,882 . . . : Now it is agreed as said contract is made by said Schaeffer for said land and for prudential purposes that the same shall be con-

veyed by warranty deed to said Schaeffer, and that John I.
Blair . . . has paid for the same by giving to said Schae-
ffer . . . the sum of $21,882 . . . to enable him to
pay for said land." The contract further recited that
Schaeffer had a contract for the purchase of other lands at
the agreed price of $44,559, and that Blair had furnished
the money with which to make the payments as they became
due, "and for prudential reasons" a deed was obtained for the
same in his (Schaeffer's) own name. It was further pro-
vided in the contract that: Within four months after Schae-
ffer shall have obtained the title to said lands, or sooner, if
desired by said Blair, said Schaeffer to make a warranty deed
to said Blair for said lands. Now it is further agreed, for
the mutual interest of said Blair and Schaeffer, it may be
deemed advisable to obtain certain releases for pretended
claims made by the Anthony heirs to said property, . . .
which sum said Blair agrees to furnish," etc. "It is deemed
for the mutual benefit of said Blair and Schaeffer that Schae-
ffer purchase 69 acres of land from John S. West adjoining
the above-described lands at a price not to exceed . . .
$27,600, and to obtain a warranty deed therefor. . . . All
money necessary to stake off lots, grade streets, advertising,
office furniture, fixtures, and rent, and stationery, taxes, and
such other expenses as may become necessary for the improve-
ment and sale of said property, . . . shall be furnished
by said Blair; said Schaeffer to receive and deduct five per
cent. commission upon gross sales of all lots sold at the
agreed price or over made by said Blair and Schaeffer.
. . . When said Blair shall have been paid in cash for all
money advanced and furnished by him for the purchase of
said land and other moneys and the interest thereon as speci-
fied, then the remainder of the property shall belong sixty
per cent. to said Blair and forty per cent. to said Schaeffer.
. . ." The contract further provided that, if the remain-
der of the property was converted into money, then Blair
shoul receive sixty per cent. and Schaeffer forty per cent. of
the proceeds. In an elaborate and well-considered opinion
the court held that the contract did not create a partnership.

In that case Schaeffer had a contract for the purchase of certain lands. So here Brossard had an option on certain mining property. In that case Blair was to furnish certain specified sums of money with which to purchase the lands covered by the contracts held by Schaeffer. So here each of the respondents was to pay Brossard a specified sum of money. In that case Blair was to be repaid the money advanced by him out of the proceeds of the sales of lands before Schaeffer could receive anything therefrom except the five per cent. commission provided for in the contract. So here the money paid by respondents and the other defendants was to be refunded out of the proceeds from the sale of ores, should any be extracted from the mine during the life of the contract, before there could be any division of profits between Brossard and Fannof. In that case the court held, and rightly so, that the relation of principal and agent existed between Blair and Schaeffer whereas in this case no such relation was created between Brossard and respondents. Brossard went into possession of the mines under his lease, and, as I have hereinbefore observed, he was accountable to no one except Fannof as to the manner in which he prosecuted the work. His rights and obligations under the lease were in no way affected by his contract with respondents. During the life of his lease he could suspend and resume work at his pleasure, regardless of their wishes and demands All of which is inconsistent with the theory that they were partners.

Counsel for respondents say in their brief: "Assuming that the relation of partners did exist, it had been terminated before the obligation sued on was incurred." The pleadings do not present an issue of this kind. Nor was the case tried on the theory that a partnership had been formed, but was dissolved before the indebtedness in question was incurred. This court, therefore, cannot consider the question, notwithstanding there is some evidence in the record which tends to support counsel's contention on this point. I am of the opinion, however, that, since the case is to be reversed on the ground that a partnership existed, the district court

to which the case is remanded should be directed to allow respondents to amend their answer, and permit them to plead as a defense this alleged dissolution of the partnership, should they so desire.

For the reasons herein stated, I am of the opinion that the judgment of the lower court should be affirmed.