MEISTER, Respondent, *v.* FARROW et al., Appellants.

(No. 7,893.)

COCHISE ROCK DRILLING MANUFACTURING CO., Respondent, *v.* GROFF et al., Appellants.

(No. 7,894.)

(Submitted May 26, 1939. Decided July 11, 1939.)

[92 Pac. (2d) 753.]

(1)

4

*Messrs. Walker & Walker* and *Mr. Harlow Pease,* for Appellants, submitted a brief; *Mr. Pease* argued the cause orally.

*Mr. Earle N. Genzberger* and *Mr. H. A. Tyvand,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This is an appeal from a judgment of the district court of Silver Bow county. The two actions involved, being identical with respect to practically all issues of law, were tried as one to the same jury; the appeals were consolidated and the two actions were presented to this court as one.

In the first action the plaintiff alleged that he performed work and services in the development of a certain mine known as the Minnie Jane Mine, and his suit was for wages allegedly owing to him. He is the assignee of claims of other persons in the same situation who allegedly have sums of money due and owing for services in and about the mining property. In the second of the two cases, the plaintiff is suing for the agreed price of certain tools and materials furnished for the development of the same mine.

The defendant Joseph T. Farrow on February 14, 1936, took an assignment of a certain lease and bond on the Minnie Jane lode mining claim from one Harry Dyer. In the original lease and bond to Dyer it was provided that the lessee was to start pumping the water from the mining property within a certain time; that the mine was to be properly equipped with machinery and hoisting apparatus; that a sufficient force be employed to work the mine at capacity; that a map be kept of the mine, and that certain development and timbering work be done. The original lease and bond provided also that any change in the ownership of the lease and bond must be properly reported to the original lessee.

The assignment from Dyer to Farrow carries the provision: "Wherefore, the party of the second part agrees to carry out all of the conditions and to assume all of the responsibilities and liabilities as agreed to and assumed by the said Harry Dyer in said lease and option to purchase and all extensions thereof."

From the record it appears that it was necessary for Farrow to raise considerable sums of money in order to finance the operations of the mine under the provisions of the original lease and bond and the assignment referred to above. The defendants, other than Farrow, are persons to whom Farrow sold an interest in his claim to the mining property, and it is upon the theory that they were co-partners of Farrow that they were joined as defendants, and it was upon this theory that the court below instructed the jury and upon which judgment was entered against them.

The amount of interest each one of the defendants received in the property was determined by the amount of contribution each made to the enterprise. Determination of the appeals rests almost entirely upon the relationship created by the agreement executed between Farrow and the other codefendants, by which an interest in the mining property was transferred to these various codefendants, and the working of the mine under that agreement. Except for the name of the purchaser, the amount

of his contribution, the date and the signature of the purchaser, all of these agreements were as follows:

"This agreement made and entered into this 21st day of February, 1936, by and between Joseph T. Farrow of Butte, Montana, the party of the first part and H. C. Packer of Hamilton, Montana, the party of the second part, witnesseth:

"That, whereas the party of the first part is the owner of a certain lease and bond on what is known as the Minnie Jane Lode Mining Claim in Independence Mining District, Silver Bow County, Montana, Survey #946, said ownership being by virtue of assignment from Harry Dyer of Butte, Montana, to the said first party, dated February 14, 1936.

"That under the terms of said lease it is necessary that said first party begin immediately preparation to work said mine and that in order to do so it is necessary that he raise funds for such operations and said second party desires to acquire an interest in said lease and bond.

"Wherefore, in consideration of Two Hundred fifty and no/100 Dollars, paid by the said second party to the said first party, the receipt whereof is hereby acknowledged, the said first party hereby agrees to assign, and by these presents does assign, to the said second party an undivided three (3%) per cent interest in and to the above described lease and bond.

"It is further understood and agreed by and between the parties that within a period of six months from the date hereof, a corporation shall be formed under the laws of the State of Montana with a capital stock of at least $100,000 divided into shares of $1.00 each, and that upon issuance of a charter to said corporation, the parties hereto agree to sell and transfer all their right, title and interest in said lease to such corporation in the same proportion as their interest in such lease and bond bears to the total interest therein.

"And the said first party agrees to at once proceed with the opening of a mine and to comply strictly with the terms of said lease and bond and start the operation of mining ore therefrom and continue mining same in as large quantity as practicable. It is further agreed that any profits derived there-

from prior to the incorporation shall be divided pro rata according to the respective interest of the parties.

"In witness whereof, the parties have executed this agreement this 21st day of February, 1936.

> "Jos. T. Farrow
> "H. C. Packer."

After judgment was entered a cost bill was filed by the plaintiffs, and in the first action the cost bill included an attorney's fee in the sum of $1,875. A motion was made to tax costs and this was granted in part, the lower court reducing the attorney's fee to $1,230.

There are numerous assignments of error. The first three and the sixteenth specifications are based on the court's denial of a motion for nonsuit, its refusal to instruct the jury to return a verdict in favor of the plaintiff in the second action, its denial of defendants' motion for a new trial, and its denial of defendants' motion to tax costs. Assignments Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, 14 and 15 all concern instructions dealing with the question of the existence or nonexistence of a mining partnership between Farrow and the other codefendants. Specification 13 alleges that the court erred in instructing the jury as to the statute providing for penalties for failure to pay wages on the fifth and twentieth day of each month. Specification 17 charges that the court erred in overruling defendants' objection to the introduction of evidence in the first case.

. Practically all of the specifications of error revolve around the question of the existence of a mining partnership, but other points are raised. For convenience we shall discuss the points in the order raised by the appellants' brief. The determination of these questions as raised by appellants' argument will dispose of all of the assignments.

The first point considered in the appellants' brief is the matter of the existence or nonexistence of a mining partnership between Farrow and the individual appellants. The determination of this question necessitates an examination of our statutory provisions and of cases previously decided by this court

8

as a preliminary approach. The pertinent sections of our Codes are sections 8050, 8051, 8052, 8054, 8055 and 8059, which read:

"8050. A mining partnership exists when two or more persons who own or acquire a mining claim for the purpose of working it and extracting the mineral therefrom actually engage in working the same."

"8051. An express agreement to become partners or to share the profits and losses of mining is not necessary to the formation and existence of a mining partnership. The relation arises from the ownership of shares or interests in the mine and working the same for the purpose of extracting the minerals therefrom."

"8052. A member of a mining partnership shares in the profits and losses thereof in the proportion which the interest or share he owns in the mine bears to the whole partnership capital or whole number of shares."

"8054. The mining ground owned and worked by partners in mining, whether purchased with partnership funds or not, is partnership property."

"8055. One of the partners in a mining partnership may convey his interest in the mine and business without dissolving the partnership. The purchaser, from the date of his purchase, becomes a member of the partnership."

"8059. The decision of the members owning a majority of the shares or interests in a mining partnership binds it in the conduct of its business."

These sections are copied from the California Code, which in ▉ turn represents what is often called the American Common Law of Mining Partnership. This special type of partnership, different in many respects from the ordinary or trading partnership, arose because of the need of the mining community for a type of association not subject to the same rules that applied to the ordinary partnership. (*Congdon* v. *Olds,* 18 Mont. 487, 46 Pac. 261.) Much of appellants' brief is directed to rules governing trading partnerships, and is not applicable here, as it may be stated at the outset that if a partnership existed here, it was a mining partnership and not a trading partnership.

Testimony was introduced to show that appellants were not mining men and had no knowledge of the practical operation of a mine. This is not important in determining whether a mining partnership existed, since a mining partnership has as one of its distinguishing features an absence of the *delectus personarum.* (*Congdon* v. *Olds,* supra.) Partners are not chosen for their skill or knowledge of the mining business, and lack of such skill or knowledge on the part of the participant in a mining venture raises no presumption that such participant is not a partner.

It is the contention of appellants that they exercised no control trol of the mining operations, and that such failure to exercise control indicated conclusively that they were not partners of Farrow. The record shows that Farrow owned more than a fifty per cent. interest in the property but under section 8059, supra, even if there were a partnership he could exercise exclusive control over the conduct of its affairs so long as his actions were within the partnership business and reasonably designed to carry out the purposes of the partnership. Testimony that the appellants exercised no control gives little aid in proving the nonexistence of the partnership. On the other hand, if the appellants did exercise some control, that would be a strong indication that they had some interest in the venture other than that of mere investors.

Whether a mining partnership existed or not depends largely upon the interpretation to be given the various contracts executed by Farrow and the individual appellants at the time the appellants purchased an interest in the enterprise. The form of these contracts has been set out in full heretofore in this opinion. The significant features of the contract for our purpose are the provisions reciting the existence of the Dyer lease to Farrow, the necessity for the development of the mine under that lease, the acquisition by the various appellants of a present interest in the Dyer lease, Farrow's promise to proceed immediately with the work on the mine in accordance with the provisions of the Dyer lease, and the provision that profits, if any, of the mining enterprise be divided pro rata according to each

10

appellant's interest in the lease. The provision as to the formation of a corporation will be discussed later.

Did the agreement and the subsequent operation of the mine create a mining partnership? Section 8050, supra, states that "a mining partnership exists when two or more persons who own or acquire a mining claim for the purpose of working it and extracting the mineral therefrom actually engage in working the same," and in section 8051 it is provided that no express agreement is necessary for the creation of the relationship, and that "the relation arises from the ownership of shares or interests in the mine and working the same for the purpose of extracting the minerals therefrom."

The first requirement, then, is that the participants own shares or interests in a mining claim. This court has held that it is not necessary that the ownership be of a mine, but that ownership of a lease and bond, such as is here involved, is a sufficient ownership of the mining lode or claim. (*State ex rel. Cole* v. *District Court*, 79 Mont. 1, 254 Pac. 863; Lindley on Mines, 3d ed., sec. 798; *Bentley* v. *Brossard*, 33 Utah, 396, 94 Pac. 736.)

The interest in the mine must be owned *in praesenti*. This is one of the reasons why the so-called "grubstake" contract does not create a mining partnership. In the grubstake contract the result sought is the discovery of a mining claim, which, when located, becomes the joint property of the prospector and the one furnishing the grubstake, and the contract usually creates a cotenancy in the property when it is discovered. It is true that after discovery a mining partnership is often formed for the purpose of working the property, but the grubstake contract does not create the relationship. (*O'Hanlon* v. *Ruby Gulch Min. Co.*, 64 Mont. 318, 209 Pac. 1062; *Prince* v. *Lamb*, 128 Cal. 120, 60 Pac. 689.)

The agreement by its terms vests an ownership interest in the individual appellants. The ownership created in each appellant is an ownership of an interest in a mining claim within the meaning of the statute, and it is a present ownership of that interest and not a future ownership as contemplated by a

grubstake contract; and the cases dealing with grubstake contracts cited by appellants are inapplicable. This contract satisfies the first requirement of the statute for the creation of a mining partnership, viz.: That the various appellants own an interest in the mining claim.

The second requirement of the statute is that those owning an interest in the claim must own or acquire the same for the purpose of working it and extracting the minerals therefrom. The contract speaks very clearly on this point. The references to the provisions in the Dyer lease requiring the immediate working of the mine, and the last paragraph in which Farrow agrees to start immediately to operate the mine and to extract ores from it, and to continue to extract ores in as large quantities as possible, conclusively point to the intent of the parties, and that intent is that minerals be extracted from the mine within the meaning of the statutory provisions quoted above.

The third requirement of the statute is that minerals be actually extracted from the jointly owned claim. That this was done here is admitted. The more difficult question to determine in deciding whether this contract and subsequent actions of the defendants were sufficient to create the relationship under the statute is the requirement that the various owners participate jointly in the extraction of the ore. The question then is, Was the ownership of the lease and bond on the Minnie Jane Mine for the purpose of joint action on the part of Farrow and the appellants in the removal of minerals, and did all of the appellants participate in the removal of minerals? It is the contention of appellants that the contract did not contemplate joint action on the part of appellants and Farrow, but rather contemplated single action on the part of Farrow. They also contend that they did not participate in any way in the mining operation.

The record shows that various individual appellants visited the mine frequently, and there is some slight testimony that some of them gave orders or directions to the employees. Had the testimony been substantial on this point, it would con-

clusively prove the participation in the mining enterprise by the appellants giving such orders or directions, as certainly the giving of orders by any of the appellants to employees engaged in working the mine would have the same result as though the appellant giving the order had actually aided in extracting ore by the use of a pick. There is testimony that Farrow and the individual appellants conferred frequently about the mining operations, both at the mine and at Hamilton. These conferences would tend to indicate participation in the management of the mining venture by the appellants.

Appellants rely on the case of *Anaconda Copper Min. Co.* v. *Butte & Boston Min. Co.,* 17 Mont. 519, 43 Pac. 924. The facts in that case differ greatly from the facts in the present case. In that case one of the co-owners was excluded from the mining property of the other co-owner, who was claiming adversely to the excluded owner. The court held that the co-owners were not mining partners, and correctly so. In this case Farrow was not claiming adversely to the appellants, and certainly he was not excluding them from the mining property, as the testimony is replete with references to visits of appellants to the mining property and to their close cooperation with Farrow.

As has been noted above, there is some testimony to indicate actual physical participation in the operation of the mine by the various appellants. However, the courts have held without exception where the question has been before them, that in order to fulfill the requirement of the joint working of the mining property, it is not necessary for the individual participants to engage in the actual physical working of the mine. This matter has been before the Montana court on at least two occasions. The earliest Montana case in point in *McIntosh* v. *Perkins*, 13 Mont. 143, 32 Pac. 653. In that case one of the parties executed a conveyance of an interest in certain mining property to another. In consideration of the conveyance the grantee agreed to develop the mining property at his own expense and to endeavor to sell the property after it was developed. The agreement provided that profits were to be shared by the grantor and

the grantee. The contract did not expressly provide that the participants be mining partners. The grantee did all of the development work, and the grantor had nothing to do with the actual extraction of the ore and had no control over the grantee in doing the work. This court held the arrangement to constitute a mining partnership. (See, also, *Congdon* v. *Olds,* supra.)

The rule in Montana, as in other jurisdictions, is that the requirement that the partners engage jointly in working the property may be met where the other features of the relationship exist, even though all of the partners do not take part in actually performing work on the mine or take part in supervising the work. A leading California case on this point is *Harper* v. *Sloan,* 177 Cal. 174, 169 Pac. 1043, 1046, 181 Pac. 775. In that case the person sought to be held as a partner furnished money for the development of the mine. The other participant, as in the *McIntosh Case,* supra, agreed to do all of the work, and he actually did all of it with no interference or control by the one furnishing the money. The court in holding that the property was being jointly operated within the requirement of the California Code provision where one of the participants contributed only money, said: "We do not understand that it is essential to a mining partnership that each of the partners shall actually perform physical work upon the claim. Where one of them supplies money which is to be used in working the claim, he is engaged in such work as truly as is the one who devotes his own labor to the enterprise."

The author in 40 C. J., section 798, page 1146, states the rule to be: "The cooperation in the working of the mine required in a mining partnership, the other elements being present, exists where one contributes the money and the other his services." He cites the *Harper Case,* supra, *Congdon* v. *Olds,* supra, and two Colorado cases: *Lyman* v. *Schwartz,* 13 Colo. App. 318, 57 Pac. 735, and *Perkins* v. *Peterson,* 2 Colo. App. 242, 29 Pac. 1135, as authorities for the rule. It does not appear that in Colorado, at the time the Colorado cases were decided there was a statute defining the relationship, but it does appear that the

rule there, as in other mining states and as in our statutes provided, is that there must be a joint working of the mine in order to create the relationship. In the *Lyman Case*, supra, the court said: "It appears that the defendants were jointly engaged in working a mine; that three of them agreed to contribute the money, and the other his services, and that they were to share equally in the result, if there was any result. This agreement shows a mining partnership."

A case relied on by the respondents, and which apparently guided the lower court largely, is the case of *Bentley* v. *Brossard*, supra. The factual situation in that case was strikingly similar to that in this case, so far as the point under discussion is concerned. There one of the parties did all of the work, including supervision, while the other parties contributed money to the enterprise. The court held it was the joint operation required to comply with the rule. The appellants argued that the law laid down in that case is bad, and state that it is contrary to the rule in other jurisdictions. This is not the case, as apparently the rule stated in the *Bentley Case* is the general rule as is stated above, and in the light of the *Congdon* and the *McIntosh Cases*, supra, is the established law in this state. What was said in the *Bentley Case* relative to the agreement is so pertinent to the agreement here that we cannot refrain from quoting it at some length. The court there said:

"To therefore arrive at a correct meaning of the defendants' contract, and to properly understand it, it must be read in connection with the lease. The object of entering into their contract was to work and develop the group of mines in accordance with the terms of the lease, and for the purpose of obtaining whatever benefits and advantages that might be derived therefrom. Such was the adventure undertaken by them and the purpose for which they associated themselves together. Their undertaking to develop and work the property was not for the benefit of Brossard alone, but was for the common benefit of all the parties to the contract. They, then, agreed as to the amounts of money that should be contributed by each. Each

party was to receive a pro rata share of the moneys derived from the sale of ores over and above the expenses of operation, and in proportion to the amount contributed by each; and likewise each was to share in like proportion to an interest in and to the property itself in the event of a successful operation and of earning and securing the option provided for in the lease. They, therefore, had a community of interest in whatever profits that were to be obtained. We thus have every requisite of a partnership, and a case where the parties in clear and unambiguous terms have, in the language of Mr. Justice Gray, joined together on an adventure, for their common benefit, each contributing money, and having a community of interest in the profits. When the writings are read, how can it be said that these defendants did not join together upon an adventure to work and develop the group of mines mentioned in the lease and under the terms and conditions as therein specified? That such joining together was not for their common benefit? That the contributions made were not for the purpose of working and developing the claims, of obtaining whatever ores that might be found from the explorations, of acquiring an interest in the property, if found valuable, and were not in furtherance of the very objects for which the parties associated themselves together? That they did not have a community of interest in whatever profits to be derived from the adventure? The terms of these contracts were precise and explicit. The language was clear and unequivocal. There was nothing doubtful or ambiguous about them which required explanation by resorting to extraneous circumstances. The court ought to have held that the agreement of the defendants created the relation of partnership.''

It seems to us that the contract here is as clear as the contract in the *Bentley Case*, and as clearly created the relationship. But even if the contract did not clearly create the partnership, the action of the parties together with the agreement creates all of the elements of a mining partnership. The appellants and Farrow owned a present interest in a mining claim; they owned

it for the purpose of extracting minerals therefrom; minerals were extracted from the property; by their contributions to the expense of operating the mine and their consent, acquiescence and encouragement of Farrow in the operation of the mine, they participated in the extraction of minerals; and by the contract they agreed to share the profits, if any, resulting from the operation of the mine. Their lack of control of Farrow in the operation of the mining property, if such was the fact, is not in conflict with the theory that the mining partnership existed. Under our statutes the owner of the majority interest in the mine has the power of control. This provision arose out of the practical history of mining operations in the west where some of the parties invested money in the development of a mine, while others participated in the actual operation or supervision of the mine, and where the control of the actual mining operation rested in the members of the association skilled in the operation of the mine. With this situation in view, the law also limited very materially the power of one partner to bind the other for the protection of the parties who are more or less inactive. By section 8052, supra, mining partners are liable for the losses of the mining venture. An agreement to share profits and losses in a business venture points to the existence of a partnership. (*Parchen* v. *Anderson,* 5 Mont. 438, 5 Pac. 588, 51 Am. Rep. 65; *Weiss* v. *Hamilton,* 40 Mont. 99, 105 Pac. 74.)

But appellants argue that the agreement amounts to nothing more than an agreement to form a corporation. The best answer to that contention is the agreement itself. It is true the agreement contemplates the formation of a corporation in the future, but it is equally true that the agreement and subsequent action of the parties, as set out above, created a mining partnership. Calling the agreement one to create a corporation does not prevent it from creating a mining partnership, if it contains such stipulations to do such things as in law constitute a partnership. *Bentley* v. *Brossard,* supra, and see the following cases where the same argument was made that the agreement was one to form a corporation and not a partnership: *Bell* v.

*Wright,* 25 Ariz. 97, 213 Pac. 575; *Roberts* v. *McKinney,* (Tex. Civ. App.) 187 S. W. 976.

The contract recited that appellants purchased a present interest; that under the lease it was necessary to do certain work on the mine at once; that work on the mine was to begin immediately, and that profits were to be shared until the corporation was formed and appellants exchanged their interests in the lease for stock in the corporation. This certainly was more than a mere agreement to incorporate, with an option on stock to be issued. It was a present agreement to join in the operation of a mine and would be effective if no corporation was ever formed.

As has been seen, much of appellants' brief deals with rules applicable to general partnerships, which rules do not control in mining partnerships. We have considered all of these cases, including the Montana cases having to do with the matter of necessity for the interchangeable relation of principal and agent to constitute persons partners in a trading partnership. The limited power of individual partners to bind a mining partnership, the nature of the agreement here and the statutory right of the owners of the majority interest to control the operation of the property distinguish this situation from that in the cases cited, and detailed discussion of this is not necessary. For the reasons given above, the court properly refused Instruction 5–A.

From what we have said it appears that instructions Nos. VII, VIII, IX, X and XI correctly state the law and the law as so stated is applicable to the case, and they were properly given. Some ambiguity may exist in No. VII as to the necessity for the joint working of the mine, but No. V in the words of the statute clearly states that requirement, and the error, if any, is so trivial as not to constitute reversible error. Proposed Instruction No. IV, from what has been said before, is inapplicable and was properly refused.

The court properly refused Instructions No. 6–A, and properly gave No. XI. The theory of 6–A is that incorporation ended the copartnership, if one existed, and of XI that

18

incorporation and transfer of Farrow's interest to the corporation made it a copartner of appellants who did not convey their interests to the corporation. Whether the instruction is correct in stating that the corporation became a copartner with the appellants need not be determined, since respondents do not seek to charge the corporation but only the appellants, and the instruction on this point does not in any way prejudice them. The appellants retained their ownership in the venture, and after Farrow's transfer of his interest to the corporation were co-owners of the mining lease, and the mining operations continued just as they had before.

Appellants' sixteenth assignment of error is based upon the ▮ court's denial of their motion to tax costs. In the cost bill was included an item for attorneys' fees in the *Meister Case* in the sum of $1,875. The court granted the motion to tax costs in part by reducing such fees to $1,230. It is argued by appellants that the only item on which an attorney's fee should have been allowed was the amount of the claim of Meister, the respondent, for his own wages, and that the right to include an attorney's fee as costs where the claim is for wages does not pass to the assignee in the assignment of a claim for wages.

Counsel on both sides admit their inability to find any authority directly in point on this question. The right to include a reasonable attorney's fee in the cost bill where an employee is forced to bring suit to recover wages due is statutory and is found in section 3089, Revised Codes of 1935. That section provides that the fee may be included "whenever it shall become necessary for the employee to enter or maintain a suit at law for the recovery or collection of wages due, as provided for by this act." Our own independent search has failed to reveal a case in which this precise question has arisen, but we feel that the situation which arose in *Thompson* v. *Twodot Fertilizer Co.*, 71 Mont. 486, 230 Pac. 588, cited by counsel, is analogous. In that case an employee, who was entitled to a preference and lien for wages earned upon filing notice with attaching creditors claiming such preference and lien, after filing the required no-

tice assigned his claim to the plaintiff in that action. It was argued that the assignment of the wage claim did not carry with it the right to the preference and lien. The court held that the preference and lien were a mere incident to the right of action, and the assignment of the chose carried with it the incident, citing section 6857, Revised Codes of 1921, and two Montana cases holding that the mere assignment of a promissory note carries with it the mortgage security incident thereto. (*Hull* v. *Diehl*, 21 Mont. 71, 52 Pac. 782, 783; *First Nat. Bank of Saco* v. *Vagg*, 65 Mont. 34, 212 Pac. 509.)

But it is argued by appellants that the *Thompson Case*, by reason of certain language used therein, holds adversely to respondents' claim for attorneys' fees. The language referred to upon which this contention is based is: ''The right to assert the preference and lien is personal and cannot be assigned, but once it has been established, it follows as an incident to the assignment of the claim.'' It will be noted that under the statute in question in the *Thompson Case*, the right to the preference and lien came into existence with the filing of a notice with attaching creditors. Until that notice was filed, the court says by way of *dictum*, it was merely a personal right and not assignable. Whether that is correct or not we need not determine, as here the right to include attorneys' fees in the cost bill did not depend upon any action prior to the instituting of the suit by the wage-earner; nor is it even necessary under section 3089, supra, to either plead or prove the item. The incidental right to include this item attached when the wage claims became due and the right to sue accrued.

As was said by the court in the *Thompson Case*, supra: ''It would seem that the assignment to the plaintiff by Marcyes of his claim against the defendants, to which the preference and lien had already attached as an incident, would carry with it the preference and lien, and that plaintiff could maintain an action thereon in his own name; if he established the debt, the incidental preference and lien would still remain with it.'' And see *Mohle* v. *Tschirch*, 63 Cal. 381, *Falconio* v. *Larsen*, 31 Or.

137, 48 Pac. 703, 37 L. R. A. 254, 4 Am. Jur., sec. 116, p. 321, and *Millington* v. *Laurer*, 89 Iowa, 322, 56 N. W. 533, 48 Am. St. Rep. 385, holding that the statutory right of a debtor to have his wages exempt from seizure for the payment of his debts is one which is capable of assignment as an incident to an assignment of the wages, and it will pass to the assignee. (Also, see, *Day* v. *Vinson*, 78 Wis. 198, 47 N. W. 269, 10 L. R. A. 205.)

The assignment of the wage claims to Meister carried with it the right to recover a reasonable attorney's fee. It is, of course, obvious that the total amount of the fee allowed, where the thirty-nine claims are established in one suit, should not total as much as it would had thirty-nine individual suits been brought. That the lower court took this into account is indicated by its reduction of the cost item for the fee from $1,875 to $1,230.

At the beginning of the trial in the *Meister Case* appellants objected to the introduction of evidence by reason of respondent Meister's failure to file a further bill of particulars. It appears from the record that the appellants filed a motion for a bill of particulars, and that in response thereto a bill of particulars was filed by Meister. The bill of particulars so filed is not included in the transcript. The only thing appearing in the record is the motion for the further bill of particulars and the minute entry of the court denying it. An informal statement delivered by counsel for Meister to counsel for the appellants appears in the record. There seems to be no way for this court to determine the sufficiency of the bill of particulars filed, as it is not before us, and certainly we may not put the district court in error for denying a further bill when we do not have the original bill of particulars for examination. From the transcript it is apparent that the material from which to determine the particular items was in the hands of the appellants, as frequent reference is made to the records of the mine and numerous canceled checks were produced in the cross-examination. No error appears by reason of the denial of the motion for a further bill of particulars.

Error is also predicated upon the court's giving of Instruction No. XII, although no argument on this point is made in the brief. That instruction, relative to penalties accruing to employees by reason of the failure of employers to pay semi-monthly wages when due, is in the language of sections 3084 and 3085, Revised Codes, and was properly given.

Appellants next argue, in the matter in which the Cochise Rock Drill Manufacturing Company is the plaintiff, that no recovery should have been allowed, basing their contention on the statutory provision—section 8058—providing: "No member of a mining partnership or other agent or manager thereof can, by a contract in writing, bind the partnership, except by express authority derived from the members thereof."

The transcript reveals that Farrow ordered certain equipment and tools for the mine from an agent of the respondent Cochise Company; that part of the equipment and tools were delivered to the Minnie Jane Mine prior to September 18, 1936; that several checks were given in payment for some of the materials so delivered, but that at least two of these checks were returned since there were not sufficient funds in the bank account of the mine to honor them. After these checks were returned, and prior to the delivery of stopers and other equipment included in the order, Farrow, at the instance of the agent of the company, executed a conditional sales contract in which is described the property actually delivered and other property ordered and to be ordered not yet delivered. The respondent company in bringing suit sued on the theory of goods sold and delivered, ignoring the conditional sales contract. By its suit it does not seek recovery of the property sold. The judgment is based on the theory of the company, and not on the conditional sales contract. No rights are claimed under the sales contract, and the recovery allowed is not by reason of the written instrument. The partnership was bound by the purchase of the property and its delivery with the promise to pay for it at the agreed price. There is no question but that the property purchased was necessary for the carrying on of the business of the venture, and it

was within the power of Farrow to bind the copartners in the purchase of these materials. ° Had no written instrument been in existence, no argument could be made that the partnership was not liable, and the existence of the instrument, upon which respondent company does not in any way rely for recovery, does not defeat its right of recovery.

Instruction No. III was properly given, and Instruction No. X, directing a verdict against the respondent company, was properly denied.

From what has been said heretofore, it is apparent that no error was committed by the court in denying appellants' motion for nonsuit, nor in denying their motion for new trial.

The judgments of the district court are affirmed.

CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES STEWART, ANGSTMAN and MORRIS concur.