RAE, Respondent, *v.* CAMERON et al., Defendants;
O'GRADY, Appellant.

(No. 8,099.)

(Submitted January 7, 1941. Decided March 1, 1941. Resubmitted April 8, 1941. Decided Finally June 5, 1941.)

[114 Pac. (2d) 1060.]

*Mr. R. H. Glover, Mr. S. B. Chase, Jr.,* and *Mr. John D. Stephenson,* for Appellant, submitted a brief; *Mr. Glover* and *Mr. Stephenson* argued the cause orally.

*Mr. John G. Brown* and *Mr. William A. Brown,* for Respondent, submitted a brief, and argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This appeal involves three causes of action, number one being for the recovery of wages for labor performed by plaintiff for defendants on certain mining operations; two, for the recovery of rental for the use by the defendants of an electric arc welder and certain materials furnished; and, three, for the recovery of wages for work and labor performed on the same mining operation by twenty-one other workmen whose claims had been assigned to plaintiff for the purpose of collection.

Three parties defendant were named, all of whom had entered into a written agreement pertaining to a placer mining venture in Jefferson county, Montana. Two of these defendants, C. G. Cameron and Dave Nimmons, filed a joint answer admitting the allegations of the complaint, but alleging also that they were not liable to plaintiff by reason of the fact that they were simply employees in charge of the venture and that their codefendant and his associates were liable for the claims. Codefendant James O'Grady filed a separate answer in which he denied the allegations of the complaint, and as to the twenty-one claims in the third cause of action alleged that plaintiff was not the real party in interest.

The cause was tried by the court sitting without a jury upon stipulated facts. Judgment was entered in favor of plaintiff,

respondent here, against all of the defendants. Defendant O'Grady is the sole appellant on this appeal.

Plaintiff's theory is that appellant O'Grady is liable on the ground that he and his two codefendants—Cameron and Nimmons—were copartners. The trial court found that "defendants were engaged in a joint adventure and that all of the allegations of plaintiff's complaint were true."

The appeal presents first for decision the question of whether in fact a joint adventure agreement was entered into between the parties and whether the parties were liable thereon for the claims involved; and, secondly, whether plaintiff, as assignee of the twenty-one wage claims for the purpose of collection in the third cause of action, is the real party in interest.

It was stipulated between the parties that there are due, owing and unpaid to the twenty-one wage claimants the amounts claimed in the complaint and as set forth in their written assignment introduced in evidence as Exhibit No. 2. It was not, however, stipulated or agreed that the amounts were due and owing from appellant, but only that they were due and owing from someone. This statement also appears in the record:

"Mr. Brown: It may be admitted that prior to the wage demands that are the subject of this lawsuit these men described in Exhibit 2 had been employed on this work and had been paid by Cameron and Nimmons from funds advanced by Mr. O'Grady and the persons that are stipulated as having been associated with him.

"Mr. Glover: By funds that were advanced by Cameron and Nimmons."

It was also agreed that the electric arc welder, subject of the second cause of action, was rented at the amount stated to Cameron and Nimmons for use on the placer grounds involved.

Was there a joint adventure? Solution of this question depends almost entirely on the written agreement between the parties, which, under the circumstances, we set forth in its entirety as follows:

"Memorandum of Agreement

"The following is a memorandum of agreement entered into between C. G. Cameron and Dave Nimmons, copartners under the firm name of Cameron & Nimmons, herein designated as the Copartnership, and James O'Grady and his associates, hereinafter designated as the Syndicate.

"First: It is understood that the Copartnership has acquired by contract, an option to purchase a lease upon the Lewis placer grounds in Mitchell Gulch, in Jefferson County, Montana, and have also acquired the right to pump the waters now in and hereafter flowing into the Economy mine and to use said waters in carrying on the placer mining operations on said placer grounds. Reference to both contracts is hereby made and the provisions thereof are to be considered part and parcel of this agreement to the same extent as if they were incorporated herein in full.

"Second: The Copartnership has solicited the Syndicate to furnish funds for the purpose of making a test of the value of said placer grounds and, in the event that said test shall prove satisfactory, to purchase machinery and equipment and to carry on the expenses and obligations of the operation of the placer mining enterprise.

"Third: The Copartnership agrees that as expeditiously as possible it will procure equipment and take other necessary steps to make a test of the value of said placer grounds, said test to be made in accordance with a plan and formula agreed upon by said Copartnership and approved by A. E. Wheeler upon behalf of said Syndicate, and for the purpose of paying the expense of said test, the Syndicate agrees to advance the funds therefor but shall not be obligated in any event to advance to exceed Four Thousand Dollars ($4,000.00) for that purpose.

"Fourth: If said test proves the ground to have a value unsatisfactory to said Syndicate, then the Syndicate shall have the right to abandon the enterprise, losing the money so advanced; but if the test is satisfactory to the Syndicate, then the Syndicate reserves to itself the right and option to furnish additional

funds to purchase machinery, equipment, to construct power lines and water lines, and to do such other things as shall be necessary in order to carry on the successful operation of said placer mining enterprise and to perform the obligations of the contracts above referred to, limiting the obligation of the Syndicate, however, to the sum of Fifteen Thousand Dollars ($15,-000.00) to be advanced by it in addition to the sum that shall be advanced for paying the expenses of the test of the ground, and the Copartnership, upon its behalf, hereby grants to the Syndicate the right and option above set forth.

"Fifth: It is agreed that the machinery and equipment shall be purchased for and in the name of the Syndicate and that the title thereto shall remain in the Syndicate until the Syndicate shall have been repaid all moneys advanced by it for the purpose of paying the expenses of making the test and for the purpose of buying the machinery and equipment and defraying the expenses of the operation and for any other purpose, the Copartnership having the right to the possession of said machinery and equipment and the right to the operation of the same in said enterprise.

"Sixth: It is further agreed that all profits derived from the operation of said placer mining enterprise shall be withheld from distribution and shall be paid over to said Syndicate until the Syndicate shall have been repaid all money that it shall have advanced for the purposes aforementioned.

"Seventh: It is further understood that in the event the test proves satisfactory to the Syndicate and the Syndicate shall elect to proceed with the further financing of the enterprise that then a corporation shall be organized, with a capital stock of One Hundred Thousand Dollars ($100,000.00), and that said lease and water agreement shall be assigned to said corporation, and after the Syndicate shall have been repaid the money advanced, the title to the machinery and equipment shall also be assigned and transferred to said corporation, and that in consideration of such transfers the Copartnership shall receive not less than Fifty Thousand Dollars ($50,000.00) and not more

than Sixty Thousand Dollars ($60,000) of the capital stock of said corporation, which capital stock said Copartnership shall distribute fifty per cent (50%) to itself and fifty per cent (50%) to James O'Grady and to the members of his Syndicate as he shall designate said members.

"Eighth: It is understood that in the event the Syndicate elects to continue the operations of said placer mining enterprise after the test, the work shall be carried on by the Copartnership until such time as the corporation may be organized and may take over the operations, but that the Copartnership shall be obligated to make transfers of said lease and contract to said corporation upon demand of said Syndicate, and that in any event the corporation shall take over the property and the operation thereof when the Syndicate shall have been repaid the moneys it shall have advanced.

"Ninth: If the Syndicate shall not have been fully repaid the money it shall have advanced at the time the corporation takes over the property, then it is understood that all profits derived from the operation of the placer mining enterprise shall be withheld from distribution and shall be paid by the corporation to the Syndicate until the Syndicate shall have been repaid all moneys advanced by it for all purposes.

"Tenth: It is agreed that the members of the Copartnership shall give their time and attention to making the test of said placer ground without any compensation to themselves for their time and effort but that they shall receive reasonable expenses incurred by them, and that in the event the Syndicate elects to proceed with the further financing of the enterprise, and during the time that the Copartnership shall carry on the operations, it is understood that the members of the Copartnership shall be paid the reasonable compensation for the services which they render, and that Three Hundred Dollars ($300.00) per month shall be considered reasonable compensation for C. G. Cameron and Two Hundred Fifty Dollars ($250.00) per month shall be considered reasonable compensation for Dave Nimmons for the time that they shall devote to the work.

"Eleventh: It is further agreed that when the corporation is organized, the Articles shall provide for five (5) directors. Two (2) directors shall consist of the members of the Copartnership and two (2) directors shall be selected by James O'Grady and the four directors so selected shall elect a fifth and that in the event of their inability to agree upon a fifth director, it is understood that S. B. Chase, Jr., shall act as the fifth director.

"Twelfth: It is further understood that when the test of the ground has been fully completed that the Copartnership will furnish the Syndicate full information with reference thereto and that the Syndicate shall at all times be privileged to observe the operations and results of said test and that after the test shall have been completed, the Syndicate shall have a reasonable time in which to determine whether it elects to proceed with the further financing of the enterprise.

"In witness whereof the parties hereto have hereunto set their hands and seals all on the 11th day of June, A. D., 1937.

C. G. Cameron    SEAL

Dave    Nimmons    SEAL

Copartnership

James    O'Grady    SEAL

Syndicate".

In disposing of this cause, we do so after having had the advantage of reargument of counsel on rehearing. At that time, emphasis was centered particularly on the proposition that the agreement contemplated no more than a loan transaction. With this contention we cannot agree, chiefly because of the contingent circumstances set forth in the agreement under which reimbursement was to be made for funds advanced, and the general tenor thereof as well. Without extended comment on that phase of the matter we content ourselves with the following quotation from 38 C. J., page 127: "A loan is temporary, a temporary letting for a temporary use. It is an essential and characteristic feature of a loan that it be returnable. The borrower expressly or impliedly promises to return the thing loaned. The word 'loan' implies an obligation to repay. From

the use of the term in its ordinary signification, the law implies a promise to repay. *If the obligation to return is based on a contingency or on a certain condition which may or may not happen or occur, the transaction is not a loan.*" (See, also, *Southern Fertilizer Co.* v. *Reams,* 105 N. C. 283, 11 S. E. 467, and *Embola* v. *Tuppela,* 127 Wash. 285, 220 Pac. 789. Compare, also, *Treat* v. *Murdock,* (Cal. App.) 55 Pac. (2d) 547, later reversed in 8 Cal. (2d) 316, 65 Pac. (2d) 881.)

Not being a loan, what justification can be found to support the trial court in its conclusion that the relationship of the parties constituted a joint adventure? In other words, what is a joint adventure? "A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly, and more particularly, as an association of two or more persons to carry out a single business enterprise for profit. It has also been defined, somewhat variantly, as a special combination of persons undertaking jointly some specific adventure for profit, without any actual partnership or corporate designation; as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge; * * * on the whole, however, it must be said that the courts have not yet laid down any very certain or satisfactory definition of a joint adventure, nor have they established any very fixed or certain boundaries thereof, but in most cases, they have been content to determine merely whether the given or conceded facts in the particular case constituted the relationship of joint adventures." (30 Am. Jur., sec. 3, p. 677, and section 7, p. 680.)

In the same text the following general observation is made, an understanding of which will assist in arriving at a solution of this cause: "It is sometimes difficult, and often unnecessary, to distinguish in particular cases between joint adventures and partnerships, since the relations of the parties to a joint adventure and the nature of their association are so similar and closely akin to a partnership that it is commonly held that their rights, duties, and liabilities are to be tested by rules which are

closely analogous to, and generally substantially the same as, those which govern partnerships. Some courts have gone so far as to say that a joint adventure is subject to exactly the same rules as a technical partnership, and must be enforced by the same principles. In general, however, it is now understood that the two relationships are not identical and that decisions defining and describing partnerships are not necessarily controlling upon the question of whether parties to a particular contract are joint adventurers. The outstanding difference between a joint adventure and a partnership is that the former relates to a single transaction, although it may comprehend a business to be continued over several years, while the latter relates to a general and continuing business of a particular kind, although there may be a partnership for a single transaction. Because of the limited scope of the relationship between joint adventurers, it is generally more informal than the relationship between partners, and some of the incidents of partnership do not, or at least may not, attach thereto." (30 Am. Jur., sec. 5, p. 679.)

A reading of the cases on the subject confirms the observation above to the effect that the courts have not laid down an exact definition of the term "joint adventure" which can be used as a general rule by means of which the ultimate question can be determined. However, certain elements are quite generally regarded as essential thereto. For example, the requisite intent of the parties:

"As between the parties themselves, the relationship of joint adventurers is a matter of intent, and arises only where they intend to associate themselves as such. So, the rule has been stated that whether the parties have created the relation of joint adventure or that of partnership, or some other relation, depends upon their actual intention, which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts." (30 Am. Jur., sec. 8, p. 681.)

A contract is also necessary as between the parties. It need not, however, "be expressed or be embodied in a formal agree-

ment, or particularly specify or define the rights and duties of the parties. It may be inferred from the conduct of the parties or from facts and circumstances which make it appear that a joint enterprise was in fact entered into. The consideration for a contract of joint adventure may be a promise, express or implied, to contribute capital or labor to the enterprise." (30 Am. Jur., sec. 9, p. 681.)

The matter of contribution is essential: "To constitute a joint adventure, the parties must combine their property, money, efforts, skill or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise." (30 Am. Jur., sec. 10, p. 681.)

Likewise, it is essential that there be joint proprietorship and control. "A joint proprietary interest and a right of mutual control over the subject matter of the enterprise or over the property engaged therein is essential to a joint adventure." (30 Am. Jur., sec. 11, p. 682.)

Lastly, the matter of sharing profits and losses is essential: "An agreement, express or implied, for the sharing of profits is essential to the creation of a joint adventure, and it has been declared that at common law, in order to constitute a joint adventure, there must be an agreement to share in both the profits and the losses. There is authority, however, that the sharing of losses is not essential, or at last, that there need not be a specific agreement to share the losses, and that if the nature of the undertaking is such that no losses other than those of time and labor in carrying it out are likely to occur, an agreement to divide the profits may suffice to stamp it as a joint adventure, although nothing is said about sharing in the losses." (30 Am. Jur., sec. 12, p. 682.)

With the above general statements as a background, let us now consider the terms of the agreement, for, in the last analysis, whether the parties intended to engage in a joint adventure "depends largely upon the terms of the particular agreement, upon

the construction which the parties have given it, as indicated by the manner in which they have acted under it, and upon the nature of the undertaking, as well as upon other facts.'' (30 Am. Jur., sec. 7, p. 680.)

A reading of the agreement discloses that the parties associated themselves together for the primary purpose of testing certain placer grounds for mineral values. Further development was contemplated if initial tests proved satisfactory. The ends sought to be achieved were for the mutual benefit of all; all stood to gain financially if the venture ''panned out'' in paying values. Contributions to the working of the enterprise were agreed upon—one party and his associates to furnish the necessary funds for operations and equipment, the other two the premises and their personal supervision and participation in the actual work. In the event of unsatisfactory results from the test, the financiers were to be out their funds, the other two, their time and effort. On the other hand, if operations proved successful, the agreement contemplated extensive development with provisions for the ultimate formation of a corporation and an equal distribution of shares of stock therein to the parties to the agreement—in other words, a community of interest in whatever profits were obtained, and in the property itself. In paragraph 3 of the agreement is found a provision to the effect that the initial test of the grounds was ''to be made in accordance with a plan and formula agreed upon by said copartnership [Cameron and Nimmons] and approved by A. E. Wheeler upon behalf of said Syndicate.'' Thus it is apparent that not only did the syndicate agree to furnish the necessary funds involved in the launching and carrying on of the venture, but also was it provided that it should have a mutual hand in the control of the subject matter of the enterprise; namely, the very important matter of selecting a plan and formula for the test. Bearing also on the element of mutual control is the fact that while the machinery and equipment was all to be purchased by the syndicate, paragraph 5

recognizes the right in Cameron and Nimmons to the possession of it for operation in the enterprise.

From this brief summation of the vital parts of the agreement, it is our opinion that all the essentials requisite to a joint adventure are present. The intent of the parties to engage in a joint venture is manifest from the contract; all are required to contribute something promotive of the enterprise; joint proprietary interest in the subject matter out of which the profits arise and a right of mutual control over the subject matter are present; and, finally, it is clear that the profits, if the venture ultimately reached that stage, were to be shared as soon as initial investments for the test, equipment and general operating expenditures had been absorbed. Compare the following cases wherein under varying factual situations the relationship of a joint adventure has been considered: *Young* v. *Reed*, (La. ·App.) 192 So. 780; *Yeager* v. *Graham*, 150 Kan. 411, 94 Pac. (2d) 317; *Miller* v. *Walser*, 42 Nev. 497, 181 Pac. 437; *McKee* v. *Capitol Dairies*, (Or.) 99 Pac. (2d) 1013; *Gardner* v. *Wesner*, (Tex. Civ. App.) 55 S. W. (2d) 1104; *Adams* v. *Harrison*, 34 Cal. App. (2d) 288, 93 Pac. (2d) 237. See, also, 33 C. J., sec. 1 et seq. and extended annotation in 63 A. L. R. 909.)

We are convinced, as was the trial court, that in legal effect, the parties by their written declarations and the subsequent putting of them into operation, intended to and did associate themselves together in a joint adventure entailing all the concomitant rights and duties common to such a relationship. Whether the agreement might also be considered as one creating a mining partnership is a question which we need not here decide. The trial court found a joint adventure to exist, and in our opinion that holding is supported by the facts of the case and the law pertaining to such arrangements.

Having determined the relationship to be a joint adventure, ▇ liability upon the members thereto follows in conformity with the terms of the written agreement. ''The rights, duties, and liabilities of joint adventures are governed, in general, by rules which are similar or analogous to those which govern the

corresponding rights, duties, and liabilities of partners, except as they are limited by the fact that the scope of a joint adventure is narrower than that of the ordinary partnership. Accordingly, as a general rule, each of several joint adventurers has power to bind the others and to subject them to liability to third persons in matters which are strictly within the scope of the joint enterprise. Thus, a member of a joint adventure can bind his associates, whether disclosed or undisclosed, by such contracts as are reasonably necessary to carry on the venture." (30 Am. Jur., sec. 41, p. 699; *Kennedy* v. *Conrad*, 91 Mont. 356, 9 Pac. (2d) 1075.)

The obligations incurred in the case at bar obviously related to matters strictly within the scope of the joint enterprise, and were reasonably necessary to carry on the venture. In fact, they were absolutely necessary if the venture were to proceed at all. That these obligations were proper charges against the members of the joint adventure is, under the general statement above, and all the equities of the case, irrefutable.

The attempted limitation of liability in the agreement on the ▇ part of those contributing the funds is not available as a defense against the liability here sought to be established. It will be remembered that in paragraph 3 of the agreement set out above $4,000 was set as the limit to which the syndicate agreed to advance funds for the purpose of making the original test of the placer grounds. Other moneys were to be forthcoming for further development—at the option of the party called syndicate— if the initial test of the grounds proved satisfactory. The record is barren of any fact relative to whether the wage claims here involved were incurred during the test stage of the venture, or during some other stage of development. In so far as liability for the wage claims is concerned, that fact is immaterial in the absence of a showing that the wage claimants had notice of such limitation. (*Kennedy* v. *Conrad*, supra; *Nolan* v. *Lovelock*, 1 Mont. 224, 9 Morr. Min. Rep. 360, and *Burgan* v. *Lyell*, 2 Mich. 102, 11 Morr. Min. Rep. 287.)

In *Kennedy* v. *Conrad,* supra, involving joint adventures, this court laid down the rule in this language: "The general rule is that, as to third persons who deal with a joint adventurer in good faith and without knowledge of any limitation upon his authority, the law presumes him to have been given power to bind his associates by such contracts as are reasonably necessary to carry on the business in which the joint adventurers are engaged, and they become liable on such contracts, notwithstanding they may have expressly agreed amongst themselves that they should not be liable."

In *Nolan* v. *Lovelock,* supra, this court, in dealing with a claim for wages against a partnership wherein a limitation on its liability and lack of authority in one partner to bind the firm for wages were asserted in defense, said: "The rule however is different. It devolves upon the firm to show that they had an express agreement with each other, that one should not contract for what was useful or necessary without the express consent of the others, and that the party contracting with any member of the firm had *notice* of this agreement. Without this the law gives authority to each member of a mining copartnership to bind the rest for what is useful and necessary in their undertaking."

In the same opinion the court also announced the rule that: "One partner in a mining copartnership has authority, by implication of law, to bind his copartners in creating a debt for the purposes of working their mine, if it appears that such work was useful or necessary for that object. (Yale on Mining Claims & Water Rights, 224, and cases there cited.) There is no doubt but that the labor performed by respondent was useful in working their mine, and that appellants received the benefit of it." (See, also, 3 Lindley on Mines, 3d ed., sec. 801.)

Any other rule would work an unwarranted injustice on that particular stratum of society which is so essential to the mining industry. Here, it is admitted that the plaintiff and the assignors—the twenty-one wage claimants—performed the labor giving rise to this action, and that they performed it in a fur-

therance of the mining activities which were the subject of the partnership agreement between the defendants. In this labor, "all the partners were interested, and in judgment of law, all are presumed to have been cognizant of its performance, and to have derived, at least some benefit from it; hence all are, as they should be, by every principle of justice, held equally responsible to the plaintiff for the payment of the services thus rendered." (*Burgan* v. *Lyell*, supra.) This statement of the law has signal application here, absent any showing of notice to the wage claimants of any limitation as to the extent that those of the adventurers agreeing to furnish funds, had, by written agreement, limited their liability with regard to the contemplated expenditures for testing or exploiting the placer grounds here involved.

The final question presented is: May this plaintiff as assignee ▮ of the twenty-one wage claims mentioned in the third cause of action maintain the action under section 9067, Revised Codes? This section provides: "Every action must be prosecuted in the name of the real party in interest, except that an executor or administrator, a trustee of an express trust, or a person expressly authorized by statute may sue without joining with him the person for whose benefit the action is prosecuted. * * * " The terms of this section have on several occasions recently been before this court for interpretation. The ultimate holdings have been, that a showing of the apparent legal title to the cause of action is not a sufficient showing to constitute a plaintiff the real party in interest within the purview of the section. (*State ex rel. Freebourn* v. *Merchants' Credit Service*, 104 Mont. 76, 66 Pac. (2d) 337, and *Streetbeck* v. *Benson*, 107 Mont. 110, 80 Pac. (2d) 861.)

Subsequent to these two decisions, there was promulgated the decision in *Northern Montana Assn. of Credit Men* v. *Hauge*, 111 Mont. 56, 105 Pac. (2d) 1102, 1103. That decision in allowing suit by the trustee of an express trust states: "An examination of the decision in that case [*Streetbeck Case*] demonstrates that it is not controlling. In the *Streetbeck Case* the facts were

that the plaintiff operated a collection agency and that by agreement with the owners of the account sued upon, the plaintiff was to retain a part of the proceeds as compensation for his services in collecting the accounts. This was admitted by the plaintiff in his statement of the facts in the case. This court said: 'This is an admission that the alleged trust agreements were entered into for the purpose of evading the effect of the above decision [*State ex rel. Freebourn* v. *Merchants' Credit Service,* 104 Mont. 76, 66 Pac. (2d) 337] of this court.' This court in its opinion held that the creation of the express trust in that case from the agreed facts was for the purpose of evading the effect of section 8980, Revised Codes, and the ruling in the *Merchants' Credit Service Case,* and the decision is based on that alone. The court did not hold by implication or otherwise that the trustee of an express trust could not maintain an action as provided in section 9067, Revised Codes, in his own name.''

This case presents a situation where the assignment is made to plaintiff as in the *Freebourn Case,* supra. In the *Freebourn Case,* as in the *Streetbeck Case,* the element of assignment for an unlawful purpose is present and although the court expressly held that no assignee such as the plaintiff here could maintain the suit, we think the holding on this point was too broad and as to that holding it is hereby expressly overruled.

Under this treatment of the cases, the law of this state is necessarily back in its rightful orbit, which is, as announced in *Genzberger* v. *Adams,* 62 Mont. 430, 205 Pac. 658, that all that is necessary to constitute a party plaintiff the real party in interest within the provisions of section 9067 is that he be vested with the legal title. The court was there dealing with an action by an assignee of a judgment who was suing for the benefit of another. We again adhere to that rule, and anything to the contrary appearing in *State ex rel. Freebourn* v. *Merchants' Credit Service, Streetbeck* v. *Benson* and *Northern Montana Assn. of Credit Men* v. *Hauge,* all supra, is expressly overruled.

"It is well settled that an assignment for collection, without any consideration being paid by the assignee, vests the legal title in the assignee, which is sufficient to enable him to recover, although the assignor retains an equitable interest in the thing assigned." (*Cohn* v. *Thompson,* 128 Cal. App. Supp. 783, 16 Pac. (2d) 364, 365, and cases therein cited; 20 Cal. Jur., sec. 9, p. 486; 3 Cal. Jur., sec. 43, p. 296; and *Kelley* v. *Hampton,* 22 Cal. App. 68, 133 Pac. 339. See, also, *Falconio* v. *Larsen,* 31 Or. 137, 48 Pac. 703, 37 L. R. A. 254, 255, quoted with approval in *Thompson* v. *Twodot Fertilizer Co.,* 71 Mont. 486, 230 Pac. 588.)

As was stated by Mr. Justice Angstman in his dissenting opinion in *Streetbeck* v. *Benson,* supra: "The purpose of that statute [real party in interest statute], so far as the debtor is concerned, is to assure him that he will not later be subjected to a second suit for the same cause." (See, also, 20 R. C. L., sec. 6.) This protection is surely afforded the debtor by express statutory provision in section 9068, Revised Codes, which provides: "In the case of an assignment of a thing in action, the action by the assignee is without prejudice to any set-off or other defense existing at the time of, or before, notice of the assignment."

In adopting this construction of the statute, we line up with the authorities in the majority of the jurisdictions throughout the United States as is indicated in 4 Am. Jur., sec. 123, p. 328; 2 R. C. L., sec. 51, p. 640; 6 C. J. S., Assignments, sec. 125; Pomeroy's Code Remedies, 5th ed., p. 106. See, also, collection of cases cited in the dissenting opinion to *State ex rel. Freebourn* v. *Merchants' Credit Service,* supra, 104 Mont. at page 110, 66 Pac. (2d) 337, and Bancroft's Code Pleading, sec. 886, p. 1308. By this construction, not only will the necessity for a multiplicity of suits in certain cases be eliminated, but also will it be made possible for wage earners with legitimate claims to unite in one action to enforce rights which individually would, as a practical matter, be lost to them by reason of the smallness of the amount involved.

Having considered all of the assignments of error and finding no reversible error therein, the judgment of the lower court is hereby affirmed.

On rehearing the opinion promulgated on March 1, 1941, is withdrawn, and this one substituted therefor.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN and ANDERSON concur.

MR. JUSTICE MORRIS:

I dissent. Mining partnerships in Montana are controlled by Chapter 162 of the Civil Code, comprising sections 8050 to 8059. This chapter was taken practically in its entirety from the California Civil Code (secs. 2511 to 2520, inclusive), and construing anything in relation to mining partnership, under the California and Montana statutes, the courts of both jurisdictions have followed very closely these statutes. Having a chapter of statutes devoted to mines and mining which contains the only statutory provisions relating to mining partnerships, that chapter must be looked to in determining what constitutes a mining partnership rather than applying statutes of a general nature.

In view of the decisions of this court relative to mining partnerships, it is my opinion that it is erroneous to classify the operations of defendant in the case at bar as a joint adventure instead of construing the contract and determining the nature of their operations relative to questions involved as a mining partnership under Chapter 162.

I see nothing in the contract between Cameron and Nimmons and O'Grady that brings their relation within the terms of a joint adventure.

33 Corpus Juris, 841 says: "A joint adventure as a legal concept is of comparative recent origin. It is purely a creature of our American courts. At common law an enterprise of a limited character, such as is now called a joint adventure, was regarded in law as merely an informal kind of partnership, and the courts made no attempt to distinguish the one from the

other. Such is still the law in England and in Canada, but in the United States the courts, about the middle of the last century, began to find it convenient to draw a distinction between them, and hence there is gradually building up a body of American law applicable to the relation of joint adventures which may or may not apply to the relation of partners. So far the divergence between the two relations is very slight; so slight in fact that it is generally asserted that they are governed by the same rules of law."

This same authority was quoted in *Snider* v. *Carmichael,* 102 Mont. 387, 407, 58 Pac. (2d) 1004, where this court had under consideration an agreement between the parties relative to the handling of an extensive sheep outfit. In working out that case, the court followed statutory authorities relating to ordinary partnerships, varying such regulations to harmonize with the trend of American decisions which is referred to in the quotation from Corpus Juris; but in view of the special statutes we have relating to mining partnerships, it seems to me that the logical course to pursue is to follow the chapter cited on mining partnerships in dealing with any controversy relative to mining operations so far as that special chapter applies.

I am unable to harmonize the majority opinion with a number of Montana cases bearing upon the questions involved in the controversy in the instant case. In *Anaconda Copper Min. Co.* v. *Butte & Boston Min. Co.,* 17 Mont. 519, 43 Pac. 924, this court laid down the rule that the foundation of the mining partnership depends upon the ownership of a share or interest in the mine. In *Eisenberg* v. *Goldsmith,* 42 Mont. 563, 113 Pac. 1127, it was in effect held that it was necessary that a person should have a personal interest in the mining claim or mine in order to be legally classified as a partner in any operations relating to the mine. In *State ex rel. Cole* v. *District Court,* 79 Mont. 1, 254 Pac. 863, this court held that lessees as well as owners may be made partners, but stressed the essential qualification of a partner in such an enterprise owning a possessory right in the property involved.

In *Meister* v. *Farrow*, 109 Mont. 1, 92 Pac. (2d) 753, 758, in considering whether certain operations by parties created a mining partnership, it was said: "The first requirement, then, is that the participants own shares or interests in a mining claim. This court has held that it is not necessary that the ownership be of a mine, but that ownership of a lease and bond, such as is here involved, is a sufficient ownership of the mining lode or claim. (*State ex rel. Cole* v. *District Court*, 79 Mont. 1, 254 Pac. 863; Lindley on Mines, 3d ed., sec. 798; *Bentley* v. *Brossard*, 33 Utah, 396, 94 Pac. 736.) The interest in the mine must be owned *in praesenti*. This is one of the reasons why the so-called 'grubstake' contract does not create a mining partnership. In the grubstake contract the result sought is the discovery of a mining claim, which, when located, becomes the joint property of the prospector and the one furnishing the grubstake, and the contract usually creates a cotenancy in the property when it is discovered. It is true that after discovery a mining partnership is often formed for the purpose of working the property, but the grubstake contract does not create the relationship. (*O'Hanlon* v. *Ruby Gulch Min. Co.*, 64 Mont. 318, 209 Pac. 1062; *Prince* v. *Lamb*, 128 Cal. 120, 60 Pac. 689.)"

In the case of *Shell Petroleum Corp.* v. *Caudle*, (5 Cir.) 63 Fed. (2d) 296, 297, the question was as to whether a mining partnership existed or not, and a labor claim against the Shell Corporation was based upon whether a partnership existed between the defendant and the Shell concern. The contract was alleged to have been entered into by one McClanahan and Shell. The court there held that "Co-operation in prospecting is not working a mine. Where property to be prospected is not jointly owned, the actual agreement controls. [Citing cases.] A proposal to share by royalty or otherwise in the results of a well-drilling venture on the property of one coadventurer does not make a partnership, where the intention is otherwise. [Citing cases.] And where an agreement is made for a future partnership, but the partnership is to go into effect only after stipulated

things are done, no partnership exists until the conditions are fulfilled."

The case of *Treat* v. *Murdock,* 8 Cal. (2d) 316, 65 Pac. (2d) 881, 883, seems to be directly in point and is largely depended upon by the defendant in the case at bar. I cannot discover in the wording of the contract in the instant case, and which is set out in the majority opinion, any intention between Cameron and Nimmons and James O'Grady representing the syndicate, to enter into any such contract as they are held for in the majority opinion. As stated before, we took our mining partnership statutes from California and the case at bar should be construed in harmony with the construction that California has followed in construing their statutes for more than fifty years, and for that reason the California case of *Treat* v. *Murdock,* supra, is quoted from at length:

"Nor does the contract of October 27th, which fixed the agreement of the parties, establish any partnership relation of Murdock with the appellants. It gave appellants no interest in the mine, but only the right to require payment of the amount owing to them from a percentage of the net proceeds of the mine. It provides that they should receive stock in a corporation to be formed by Murdock when and if he secured some outstanding interests in the mine. But the entire tenor of the instrument shows that its purpose was to evidence an agreement that certain funds should be applied to payment of appellants' note, with interest, and that in addition they should receive either 14 per cent. of the net proceeds of the mine or 10 per cent. of the stock of the corporation to be formed as compensation for the use of the money. These provisions clearly show the transaction to have been a loan, and that the appellants never acquired or contracted to secure title to the mining property or any interest in it.

"The code provisions concerning mining partnerships have been considered in numerous cases. It has uniformly been held that ownership of the mine, or an interest in it or an option to purchase it or the right to possession of it is a pre-

requisite for the existence of such a partnership. (*Michalek* v. *New Almaden Co., Inc.*, 42 Cal. App. 736, 184 Pac. 56; *Stuart* v. *Adams,* 89 Cal. 367, 26 Pac. 970; *Prince* v. *Lamb,* 128 Cal. 120, 60 Pac. 689.) There is also the further requirement that the partners actually engage in working the mine. This does not mean that each of the partners must perform physical labor in the mine but it does require that each of the partners have some part in carrying on the mining operations. 'The partnership arises only when the co-owners unite and co-operate in working the mine.' (*Peterson* v. *Beggs,* 26 Cal. App. 760, 148 Pac. 541, 542.) Each of these elements of a mining partnership is entirely lacking in the record in the instant case. The appellants never acquired any interest whatever in the mining property and the uncontradicted evidence is that they never did any work on the property, they never directed any of the mining operations or had anything to do with the management of the mine.

''On the contrary, the conduct and writings of the parties point unmistakably to the relationship of debtor and creditor. The fact that Murdock agreed to give appellants certain stock in a corporation if and when it was formed does not supply any of the requirements of a mining partnership. Nor does the agreement of Murdock to pay appellants' note out of a percentage of the net proceeds of the mine and to continue to pay them a share of those proceeds after the note was satisfied fix the relationship of partners. In the case of *Spier* v. *Lang,* 4 Cal. (2d) 711, 713, 716, 53 Pac. (2d) 138, 141, the court said that 'this feature of the agreement has long been held not to require a conclusion that a partnership relation existed where also there was no joint participation in the management and control of the business, and the proposed profit-sharing was contemplated only as compensation or interest for the use of the money advanced.' ''

I can find no precedent in California, or in Montana, or any other state, where parties have been held to have been partners in a mining enterprise or as joint adventurers where the facts

are similar to those involved here and under statutes similar to ours. Neither have I been able to find any case held to be a joint adventure in which the interested parties did not have a property interest in the property involved.

On the question of the right of Rae, the plaintiff in the action at bar, to maintain the action on behalf of all the interested parties, attention is called to sections 8943, 8944, 8980, 9067 and 9629, Revised Codes, and the comments made relative thereto in the case of *State ex rel. Freebourn* v. *Merchants' Credit Service,* 104 Mont. 76, 66 Pac. (2d) 337, and the case of *Streetbeck* v. *Benson,* 107 Mont. 110, 80 Pac. (2d) 861, both cases being overruled in certain particulars by the majority in the instant case. The purpose of the construction given to the statutes mentioned in above cases was two-fold; first, to prohibit collection agencies from practicing law and exercising the reprehensible methods many of them frequently followed in extorting money from unfortunate debtors, and, second, to prevent those authorized to practice law in Montana from violating the clear provisions of section 8980, supra.

It was not the intention, as I understand it, that either of the decisions mentioned should be construed to mean that creditors, such as those beneficially interested in the case at bar, in order to save costs of litigation, might not in good faith assign their claims to one of their number for collection in one action. No one may practice law in this state until licensed by authority of this court and when licensed they become officers of the court, and a solemn obligation rests upon this court to see that its officers demean themselves in a manner becoming officers of the highest tribunal of this state. It was unnecessary, in my opinion, for either of those opinions to be modified in arriving at the conclusions the majority reached, and I am further of the opinion that such modification will tend to relax the wholesome restraint imposed upon lawyers who are inclined to indulge in practices inimical to the approved ethics of the profession.

Rehearing denied July 1, 1941.